**SIERRA CLUB, Plaintiff,**

v.

**LYNG, et al., Federal Defendants,**

**and**

**Colorado Water Congress, et al., Defendant-Intervenors.**

Civ. A. No. 84–K–2.

United States District Court, D. Colorado.

June 3, 1987.

Lori Potter, Sierra Club Legal Defense Fund, Denver, Colo., for plaintiff.

John R. Hill, Jr., U.S. Dept. of Justice, Land & Natural Resources Div., Denver, Colo., Stuart Shelton, Office of General Counsel, Dept. of Agriculture, Washington, D.C., Richard Nolan, Asst. U.S. Atty., Jack F. Ross, Melvin B. Sabey, James F. Engelking, Saunders, Snyder, Ross & Dickson, Denver, Colo., Special counsel for City and County of Denver.

Casey Shpall, Mountain States Legal Foundation, Denver, Colo., for Mountain States Legal Foundation.

Wayne D. Williams, Michael L. Walker, Henry C. Teigen, Denver, Colo., for City & County of Denver Acting by and through its Board of Water Com'rs.

Robert A. Hykan, Asst. Atty. Gen., Denver, Colo., for Colorado Water Conservation Bd.

John M. Sayre, Gregory J. Hobbs, Jr., Zach C. Miller, Bennett W. Raley, Davis, Graham & Stubbs, Denver, Colo., for Colorado Water Congress.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

Sierra Club brought this action against the federal defendants seeking a declaration of federal water rights in designated wilderness areas in the State of Colorado.

A more complete statement of the background of this controversy may be found in the last memorandum opinion and order issued in the case. *See Sierra Club v. Block,* 622 F.Supp. 842 (D.Colo.1985).

In *Sierra Club I,* I held, *inter alia,* "that federal reserved water rights do exist in previously unappropriated water in each of the Colorado wilderness areas designated as such pursuant to the Wilderness Act and managed by federal defendants." *Id.* at 862. I then remanded the action to the federal defendants, directing them "to come forward with a memorandum explaining their analysis, final decision, and plan to comply with their statutory obligations regarding protection and preservation of wilderness water resources." *Id.* at 865.

Defendants appealed from my order "requiring them to prepare a plan to comply with their statutory duty to preserve reserved water rights in wilderness areas." *Sierra Club v. Lyng,* Nos. 86–1153, 86–1154, 86–1155, slip op. at 3 (10th Cir. October 8, 1986). The Tenth Circuit determined appellate jurisdiction was lacking. The appeal was dismissed and the case remanded. *Id.,* slip op. at 4–5.

A scheduling conference was held on remand on November 6, 1986. The federal defendants were directed to file the ordered plan within 45 days. Plaintiff and intervenors were permitted to file written comments within 30 days of receipt of the plan. The government was granted 20 days to reply to those comments.

On November 25, 1986, intervenors filed a motion for summary judgment. This motion has been fully briefed and awaits decision.

The government report was filed on November 26, 1986. Intervenors responded to the report on December 19, 1986. On January 2, 1987, Sierra Club filed a combined motion for partial summary judgment and response to the government's plan. That motion is also ripe for decision.

*Intervenors' Motion for Summary Judgment*

Intervenors request entry of "summary judgment for defendants on all causes of action alleged in this matter, on the grounds that no federal water rights were impliedly reserved when wilderness areas were designated within national forests in the state of Colorado." Defendant-Intervenors' Motion for Summary Judgment. Intervenors argue that legislative history of the Wilderness Act "first discovered by defendant-intervenors after the court issued its November 25 [1985] order.... compels the modification of the court's previous order to hold that the act did not create any federal reserved water rights." Brief in Support of Defendant-Intervenors' Motion for Summary Judgment, at 2.

As an initial matter, intervenors' motion is not a de novo motion for summary judgment. Rather, it is actually a motion for reconsideration of my opinion and order now housed in 622 F.Supp. 842. The difference is important. In view of the November 25, 1985 opinion and order, I do not write on a clean slate. Intervenors' motion must be considered within the context of my previous opinion and order.

Intervenors invoke § 4(d)(7) of the Wilderness Act, 16 U.S.C. § 1133(d)(6), in support of their motion. This provision of the act was not accorded specific consideration in my earlier opinion. Intervenors assert application of the legislative history behind this statutory provision mandates reversal of my holding that federal reserved water rights do exist in the designated wilderness areas.

In its entirety, 16 U.S.C. § 1133(d)(6) is composed of this single sentence: "Nothing in this chapter shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws."

By focusing on selected portions of the legislative history of this provision, intervenors have decided "that the section 4(d)(7) language was intended to forbid new federal water rights which could interfere with water projects." Intervenors' Supporting Brief at 9. Intervenors' reading of the legislative history leads them to conclude: "[M]embers of Congress consistently stated that wilderness legislation should not create any new federal water rights which would interfere with western

water development [by the states]." *Id.* at 10.

The federal defendants disagree. The government believes "these portions of the legislative history reflect a Congressional intent to be neutral on the question of reserved water rights and ultimately, therefore, they prove nothing." Federal Defendants' Response Brief at 2. Examination of other portions of the Wilderness Act, specifically § 4(d)(4),[1] has convinced the government that § 4(d)(7) merely indicates the act "was to be neutral as to existing water law." Federal Defendants' Response Brief at 6.

The government supports its argument by directing my attention to sections 13(b), (c) and (d) of the Wild and Scenic Rivers Act, 16 U.S.C. § 1284(b)–(d).[2] There, "Congress incorporated the identical wording of section 4(d)(7) of the Wilderness Act with language that recognizes the possible federal taking of privately-held water rights,...." Federal Defendants' Response Brief at 8.

Plaintiff also takes issue with intervenors' assessment of § 4(d)(7). Plaintiff reiterates and expands on some of the arguments propounded by the government. The Sierra Club also adds arguments of its own. *See, e.g.,* Plaintiff's Response Brief at 2 (intervenors' argument is based on draft language that was not passed into law).

I need not delve into the labyrinthine complexities of each of these arguments. It is axiomatic that "[w]here, as here, resolution of a question of federal law turns on a statute and the intention of Congress, [I] look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). I do not find the statutory language of § 4(d)(7) to be unclear. Hence, there is no need to resort to the legislative history of that section.[3] This conclusion moots the primary thrust of intervenors' argument.

A plain reading of § 4(d)(7) indicates that section is simply a disclaimer. "By its drafting and passage of section 4(d)(7) of the Wilderness Act, 16 U.S.C. § 1133(d)(6), Congress meant to do nothing more than to maintain the *status quo* of basic water law.... Nothing in sections 4(d)(7) and 4(d)(4) ... supports the extreme implications attributed to them by the defendant-intervenors." Federal Defendants' Response Brief at 10.

Courts often bear the responsibility of adjudicating the interaction between newly created congressional programs and pre-existing state law.[4] Case-by-case harmonization of a congressional mandate with state law fulfills the assignment given the courts in the separation of powers process contemplated by the Constitution. In Section 4(d)(7), Congress sanctioned this completely

1. Section 4(d)(4), 16 U.S.C. § 1133(d)(4), states: Within wilderness areas in the national forests designated by this chapter, (1) the President may, within a specific area and in accordance with such regulations as he may deem desirable, authorize prospecting for water resources, the establishment and maintenance of reservoirs, water-conservation works, power projects, transmission lines, and other facilities needed in the public interest, including the road construction and maintenance essential to development and use thereof, upon his determination that such use or uses in the specific areas will better serve the interests of the United States and the people thereof than will its denial; and (2) the grazing of livestock where established prior to September 3, 1964, shall be permitted to continue subject to such reasonable regulations as are deemed necessary by the Secretary of Agriculture.

2. The Wild and Scenic Rivers Act was enacted four years after passage of the Wilderness Act.

3. By contrast, in *Sierra Club,* 622 F.Supp. 842, I had recourse to legislative history as one part of my effort to determine the applicability of the doctrine of *implied* reservation of water rights. *See, e.g., id.* at 852, n. 7; *id.* at 859. Here I need not delve so deeply in order to infer congressional intent, since that intent is apparent from the face of the statute.

4. An illustrative example of this phenomenon is provided by *Pacific Gas & Electric Company v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). That case emerged "from the intersection of the Federal Government's efforts to ensure that nuclear power is safe with the exercise of the historic state authority over the generation and sale of electricity." *Id.* at 194, 103 S.Ct. at 1717.

normal process by expressly disclaiming any decisional responsibility in this regard. Thus, § 4(d)(7) not only fails to support the intervenors' conclusions, it actually *negates* the inferences sought to be drawn. By its own terms, § 4(d)(7) does not purport to work any substantive change in the rights parties may acquire under the various doctrines of water law, including the reserved rights doctrine. Any decisions in that regard are properly left to case-by-case adjudication.

My conclusion that federal water rights were impliedly reserved when wilderness areas were designated within national forests in the State of Colorado receives additional direct support in pronouncements of the United States Supreme Court, the Colorado Supreme Court, and the Solicitor General of the Department of the Interior. For instance, in *United States v. City and County of Denver*, 656 P.2d 1 (Colo.1982), the *en banc* Colorado Supreme Court held:

> After *Cappaert [v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976) ] and [*United States v.*] *New Mexico* [438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978) ], it is clear that the implied reservation doctrine applies to all federal *enclaves* and that the federal government may acquire rights to unappropriated water on federal lands when the land has been reserved pursuant to congressional authorization for a specific federal purpose that requires the use of water. Denver's arguments to the contrary must therefore be rejected. Accordingly, we conclude that the United States possesses reserved rights for its federal *reservations* in Colorado in waters unappropriated upon the date of reservation of the federal lands from the public domain, and in the amount necessary to achieve the primary purposes of the reservations.

> *Id.* at 20 (emphasis added).

The *Denver* opinion analyzed the extent of the federal reserved water rights doctrine in the following areas: national forests, Dinosaur National Monument, Rocky Mountain National Park, public springs and waterholes, and mineral hot springs. Although the court did not discuss the meaning of either of the terms "enclave" or "reservation," it apparently intended to use those terms as a general descriptive synonym for the more specific types of areas listed above.

*Denver* does not include a discussion of wilderness areas. This omission, however, was appropriate. The *Denver* court did not have occasion to consider application of the federal reserved water rights doctrine to wilderness areas because the federal government did not seek any such adjudication in that case.[5] Thus, *Denver* does not imply that the reserved rights doctrine does not apply to wilderness areas. The judicial analog to the statutory maxim *expressio unius est exclusio alterius* has no relevance here. Wilderness areas are *ejusdem generis* with the national forests, monument, park, springs and waterholes considered as reserved federal land in *Denver*. In addition, I have previously decided that wilderness areas were withdrawn and reserved. *Sierra Club*, at 854–857. I therefore find *Denver* to be supportive of my earlier holding that "federal reserved water rights do exist in previously unappropriated water in each of the Colorado wilderness areas designated as such pursuant to the Wilderness Act and managed by federal defendants." *Sierra Club*, at 862.

Further support is found in the opinions of the United States Supreme Court. In *United States v. District Court for Eagle County*, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971) the Court flatly stated:

> The federally reserved lands include *any* federal *enclave*. In *Arizona v. California* we were primarily concerned with Indian reservations.... Here the United States is primarily concerned with reserved waters for the White River National Forest....

> *Id.* at 523, 91 S.Ct. at 1001 (emphasis added).

---

**5.** Indeed, the federal government's failure to do so spawned this suit. Second Amended Complaint, ¶ 11.

Here again the term "enclave" is not specifically defined, but the Court uses it in a very broad sense. *See also Colorado River Water Conservation District v. United States*, 424 U.S. 800, 810, 96 S.Ct. 1236, 1242, 47 L.Ed.2d 483 (1976) (extending the logic of *Eagle County* to a case involving reserved rights on Indian reservations).

Also, I am impressed by the opinion of the Solicitor General of the Department of the Interior that wilderness areas are included in this fundamental categorization. The Solicitor General has plainly and succinctly concluded "that *formally designated wilderness areas receive reserved water rights* necessary to accomplish" the purposes of "preserving and protecting wilderness in its natural condition without permanent improvements or human habitation," and "to fulfill public purposes of recreation, scenic, scientific, educational, conservation, and historic use." 86 Interior Decisions (I.D.) 553, 609–10 (1979) (emphasis added).[6]

The Solicitor General has further expressly concluded that § 4(d)(7) of the Wilderness Act does not undercut the implied reserved water rights doctrine. "Rather, *the provision is intended to continue existing principles of federal-state relations in water law, which includes the reserved water rights doctrine.*" 86 I.D. at 610 (emphasis added). *Accord id.*, at 610, n. 106 ("Congress intended to continue the *status quo* which allows for the creation and assertion of reserved water rights on lands withdrawn and reserved under the Wilderness Act").

■ In sum, section 4(d)(7) has no impact on the earlier analysis and decision rendered on the issue of the existence of federal reserved water rights in Colorado's designated wilderness areas. Accordingly, I decline to reverse or otherwise modify the position adopted in the opinion and order reported at 622 F.Supp. 842. The further research and thought necessitated by intervenors' request for summary judgment

upon reconsideration strengthens my conviction of the accuracy of the position taken in that opinion. Therefore, I deny intervenors' motion for summary judgment.

*Plaintiff's Motion for Summary Judgment*

Plaintiff has moved for summary judgment on paragraph (d) of its request for relief in the second amended complaint. That paragraph seeks

[a] judgment declaring that defendants' proposal to protect water rights in wilderness areas through purchasing or condemning water rights, denying land exchanges and rights of way, bringing trespass or nuisance actions, acquiring lands by exchange or purchase, requiring release flows under § 505 of FLPMA [Federal Land Policy and Management Act], or by 16 U.S.C. § 1133(4), is arbitrary and capricious.

Plaintiff's motion is proffered as a combined motion and response to the government's plan. A copy of this plan, in its portentous three page entirety,[7] is attached to this memorandum opinion and order. Plaintiff's supporting memorandum brief contains two primary arguments in opposition to the plan. First, plaintiff argues the reserved rights doctrine provides "the only assured means of protecting wilderness water resources in perpetuity. The Forest Service's inaction violates their [sic] duty under the Wilderness Act." Plaintiff's Memorandum Brief at 4. This position contradicts the government's assertion that "claiming wilderness reserved rights is at best, only a marginally effective means of protecting national forest wilderness water resources in Colorado." Plan, at 2.

Plaintiff next asserts the government's reliance upon certain alternatives has no rational basis. These alternatives are also listed in the plan. Plan, at 2–3.

I will accord each of plaintiff's two basic contentions separate consideration.

---

6. The Solicitor General's 1979 opinion has been twice supplemented. Neither supplement, however, has disturbed that portion of the opinion which addresses federal reserved water rights.

88 I.D. 1055, 1055, n. 2 (1981); 88 I.D. 253, 254, n. 3 (1981).

7. The plan is actually only slightly longer than two pages.

*Efficacy of Reserved Water Rights*

The efficacy of application of the doctrine of federal reserved water rights in the wilderness areas can be understood only in the context of this state's water law system. Colorado is unique in subscribing to a pristine prior appropriation system. Under this regime, "[t]he first person to divert unappropriated water and to apply it to a beneficial use has a water right superior to subsequent appropriators from the same water resource." *Navajo Development Co., Inc. v. Sanderson,* 655 P.2d 1374, 1377 (Colo.1982). Other states which adhere to the appropriation doctrine employ a permit system. Whether this distinction make a critical difference is beyond the purview of this opinion.[8]

■ "[T]he priority date of an appropriation will relate back to the date on which an appropriator took the first step to secure a water right as long as the application of water to beneficial use is completed with reasonable diligence." *City and County of Denver v. Colorado River Water Conservation District,* 696 P.2d 730, 745 (Colo. 1985). Before completion of the appropriation, a reasonably diligent appropriator may establish a conditional water right through judicial decree. *Id.,* at 745; Colo. Rev.Stat. § 37–92–103(6).

The Colorado water law scheme, however, is more than a modern version of the maxim "first in time, first in right." While "[w]ater rights are *obtained* by a combination of acts and intent constituting appropriation and are not dependent upon adjudication," the "failure to *adjudicate* the rights results in the rights being junior to rights previously adjudicated." *United States v. Bell,* 724 P.2d 631, 642 (Colo.1986) (emphasis added). The adjudication component of the priority date analysis is contained in this statute:

> With respect to each [water] division ... the priority date awarded for water rights or conditional water rights adjudged and decreed on applications for a

determination of the amount and priority thereof filed in such [water] division during each calendar year shall establish the relative priority among other water rights or conditional water rights awarded on such applications filed in that calendar year; but such *water rights or conditional water rights shall be junior to all water rights or conditional water rights awarded on such applications filed in any previous calendar year....* Colo.Rev.Stat. § 37–92–306 (emphasis added).

■ The principle enunciated in § 37–92–306 is called the postponement doctrine. 48 U.Colo.L.Rev. 547, 555 (1977). The existence of this doctrine demonstrates that the appropriation date is not the sole factor used to determine the appropriator's priority. Rather, the adjudications contemplated by § 37–92–306 also have a hand in the establishment of that priority. A water user who appropriates before a junior appropriator can nevertheless lose his senior priority relative to that junior appropriator if the junior appropriator adjudicates his own water right in any calendar year preceding the senior appropriator's adjudication. By failing to complete a prior adjudication, or by failing to join in the same calendar year adjudication as the junior appropriator, the senior appropriator's priority is subordinated to that of the junior appropriator.

For overappropriated water courses, or in times of water shortage in water courses which are otherwise normally underappropriated, priority becomes the linchpin of the water right. Indeed, the true value of the water right "is that it allows a *priority* to the use of a certain amount of water at a place somewhere in the hierarchy of users who also have rights to water from a common source such as a lake or river." *Navajo,* at 1377. "[T]o deprive a person of his priority is to deprive him of a most valuable property right." *Id.* at 1378, quoting

---

**8.** I do not intend to be understood to attempt a complete exposition of water law. Even if such a monumental task were possible within the limited confines of this opinion, I would defer to the Colorado statutes and cases which embrace the full contours of water law in this state. I merely set forth basic principles of water law in an effort to explicate the interaction of state law with federal reserved water rights. Only by illuminating this interaction can the efficacy of the wilderness area federal reserved water rights be properly understood.

*Nichols v. McIntosh,* 19 Colo. 22, 27, 34 P. 278, 280 (1893).

Traditionally, "sovereign immunity barred involuntary joinder of the United States as a party in state court general water rights adjudication." *Bell,* at 640–41. Thus, the extent to which federal water rights were subject to the reach of the state water law scheme was unknown. This situation was "frustrating and completely contrary to orderly procedure." *United States v. District Court for Eagle County,* 169 Colo. 555, 458 P.2d 760, 772 (1969), *affirmed,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971).

In 1952, the Congress ameliorated this frustration and confusion by passing the McCarren Amendment. In pertinent part, the amendment provides:

> Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: Provided, that no judgment for costs shall be entered against the United States in any such suit.
>
> 43 U.S.C. § 666(a).

"The immediate effect of the Amendment is to give consent to jurisdiction in the state courts concurrent with jurisdiction in the federal courts over controversies involving federal rights to the use of water." *Colorado River,* at 809. The McCarren Amendment thus allows "a determination of the extent of federal water rights." *Bell,* at 641. Under the amendment, this determination may be made in the state water courts. *Navajo,* at 1379.

Although often "relied upon as evidence of congressional recognition of the primacy of the western states' interests in regulating and administering water rights," the McCarren Amendment "does not affect the federal government's substantive rights with respect to water on federal land." *Denver,* at 9. "Federal water rights exist independently of state law and state procedures." *Bell,* at 641, citing *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). *Accord,* 86 I.D. at 573. Moreover, the "federal reserved rights vest on the date of the land's reservation by the federal government." *Bell,* at 641, citing *Denver, Navajo,* and *Cappaert; accord, Sierra Club,* at 862. In *Navajo,* the Colorado Supreme Court stated:

> Federal reserved water rights, by their nature, exist from the time that the legislative or executive action created the federal enclave to which the water right attaches.... Reserved waters ... are not dependent on state appropriation law for their existence. Conceptually, federal reserved waters are withdrawn from unappropriated waters which exist at the time the federal enclaves were created. At that moment, the federal enclave has a priority to an amount of water necessary to fulfill the enclave's purpose; the water right is not subject to defeat by subsequent appropriators.
>
> *Navajo,* at 1379 (footnote omitted).

■ These legal principles lead to the ineluctable conclusion that federal reserved rights can arise "without any physical appropriation and application to a beneficial use," 30 Stan.L.Rev. 1111, 1113 (1978), at least as the terms "appropriation" and "beneficial use" are defined in standard water law adjudications between private parties. The federal reserved water right "does not require that water be put to actual use, and therefore is different from the concept of appropriation of water upon which Western States principally, but not exclusively, rely." 86 I.D. at 573 (footnote omitted). Thus, "state law appropriators acquiring rights after a federal reservation

receive only a defeasible property right until the extent of the reserved federal right is established." 30 Stan.L.Rev. at 1113–14, quoted in *Sierra Club I* at 852, n. 7.

The existence of federal reserved water rights independent of the appropriation doctrine, however, does not necessarily entail the same result with respect to the postponement doctrine. In *Navajo*, the Supreme Court of Colorado observed "[w]e have not yet been presented with the question whether federal priority dates are determined under Colorado's system of adjudication." *Id.*, at 1379, n. 3.

The issue was presented, however, in *Bell*, where the United States claimed federal reserved water rights for certain tracts of reserved federal lands, including Naval Oil Shale Reserves (NOSRs) numbered 1 and 3. The government's 1971 application regarding these two NOSRs sought an adjudication of claims to those portions of the Colorado and White Rivers, including tributary streams, located "in or on" NOSR–1 and NOSR–3. In 1983, the government sought leave to amend its application to add claims to mainstem Colorado River water. This mainstem water did not flow in or on NOSRs 1 or 3. *Id.*, at 634–35.

The water court refused to permit the amendment. On appeal, the state supreme court affirmed. The court concluded that "[n]either the original application nor any other source cited gave adequate notice to non-parties of the source of the water claimed in the amendment." *Id.*, at 640. Thus, the "relation back" doctrine of Colo. R.Civ.P. 15(c) could not apply and an amendment was improper.

This holding had far-reaching implications for the government. The effect of the water court's ruling on the motion to amend was "not only to deny the relation back of the mainstem Colorado River claim to 1971 but also to deny the mainstem Colorado River claim a priority date based on the dates of the NOSRs' reservation." *Id.*, at 640. The court continued:

In failing to claim water from the Colorado River mainstem in 1971, the United States ignored the equivalent of a filing deadline. Except for the adjudication of water rights involving wells, section 37–92–306 provides that water rights or conditional water rights filed within the same calendar year are junior in priority to water rights or conditional water rights awarded on applications filed in previous calendar years.... After litigation resolving the water court's jurisdiction over the reserved rights' claims of the United States ended in 1971, the federal government had the remainder of the year to state its antedated claims. The United States failed to file its claim to mainstem Colorado River water before the end of 1971. Therefore, the postponement doctrine applies to the amendment and prevents its antedation.

*Id.* at 643–44 (footnote omitted).

The court further opined:

In integrating federal and state water rights, we have compared federal reserved rights to conditional senior water rights, for which a holder must obtain a finding of reasonable diligence by a water referee every four years after application.... Similarly, by not filing all of its claims for reserved water for the NOSRs within a single calendar year the United States has not met the deadline for antedation.

*Id.* at 644.

At this point in its opinion, the supreme court footnoted:

Our treatment of the United States' claims to reserved water rights is similar to our treatment of *unadjudicated* appropriative rights prior to adoption of the statute requiring adjudication of nonirrigation rights.... If the holder of appropriative rights appeared in the first available adjudication after the date of the act, the adjudication resulted in a priority date based on the initial appropriation.... If the holder of the nonirrigation appropriative right failed to assert the right in the first adjudication following the effective date of the 1903 act, the right's priority date could not antedate that of a priority confirmed in any prior adjudication.

*Id.* at 644, n. 16 (emphasis added).

In sum, the court clearly found the postponement doctrine applied to the United States in its efforts to adjudicate reserved federal water rights.[9] This conclusion was additionally supported by policy considerations:

> Were the amendment to relate back to the original application, and thus antedate prior claims, the purposes of the McCarren Amendment would be frustrated, and the United States would have avoided the equivalent of a filing deadline.

*Id.*, at 642.

The court similarly noted that "unless the new claim added by the amendment is subject to the postponement doctrine in section 37–92–306 the United States would have no incentive to file all claims to reserved water rights at one time." *Id.* at 645.

The government's plan in this case, and plaintiff's motion for summary judgment, must be juxtaposed against this somewhat lengthy background. The plan concedes "there are a number of conditional water rights within the designated wilderness areas." The plan concludes, however, that "[m]ost of these rights are of doubtful validity for failure of their owners to satisfy the diligence requirements of Colorado law."

"With regard to the twenty-four identified national forest wilderness areas," the plan denotes "four adjudicated absolute rights [which] are on private land and situated in a position to affect wilderness water resources. All of these rights are senior to the respective wilderness designations." Further, "[a] total of three conditional rights are on private land in a position to affect wilderness water resources in the event that their owners attempt to perfect them."

The first portion of the plan concludes that "[i]n light of the absence of any identified present threats to wilderness water resources, it is unnecessary for the Forest Service to make any recommendation at this time." Nevertheless, the plan ventures the proposition that "claiming wilderness reserved rights is at best, only a marginally effective means of protecting national forest wilderness water resources in Colorado." The reasoning propounded in support of this conclusion is disconcertingly glib:

> Any reserved right that might ultimately be held to exist would be junior to all rights existing at the time of wilderness designation which includes most of the rights discussed above. In addition, wilderness reserved rights could possibly be subject to the Colorado postponement doctrine, ... making them junior to virtually all presently adjudicated rights.

■ As the government's reasoning is glib, its conclusions are facile. Absent congressional action, the government's reserved water rights cannot be lost in the sense of falling prey to total elimination. They can, however, be effectively rendered meaningless through gradual subordination to the water rights of junior appropriators who adjudicate the extent of their rights before the government takes any such action. Thus, operation of the postponement doctrine does not support the government's view that no adjudicative action should be taken at the current time. Rather, the government's recitation of the postponement doctrine supports precisely the opposite conclusion—namely that with each passing year, the threat of adjudicative preemption of the priority of reserved federal water rights remains as strong a threat as ever.

Possibly, the government's benign neglect will not necessarily prejudice the priority of its reserved rights. Under the McCarren Amendment, "all water users on a stream, in practically every case, are interested and necessary parties to any court proceedings." *Colorado River*, 424 U.S. at 811, 96 S.Ct. at 1243, quoting legislative history; *accord, Bell*, at 642. Thus, in any future adjudication initiated by any

---

**9.** This conclusion is not undermined by *Bell* footnote number 14. I interpret that note to constitute a synopsis of previous occasions in which the Supreme Court of Colorado addressed the general issue of the initial date of priority, that is, the date of initial reservation. Those decisions did not involve consideration of the additional, and vital, factor of adjudication inherent in the postponement doctrine.

junior appropriator, the government should be a named defendant. As such, the government would then have until the remainder of that calendar year in which to move to protect its reserved rights. The parties to this litigation, however, have not discussed this issue and I do not purport to decide it.

Even if the hypothesis in the previous paragraph were correct, the government's rationale is still flawed. First, the government's mere presence in an adjudication does not guarantee prompt protection of all of its water rights. Indeed, such was the case in *Bell*. As Justice Erickson noted in his *Bell* concurrence, the McCarren Amendment has no application where the government is not a defendant. *Bell* at 647. Thus, should the government at some time choose to adjudicate certain water rights but fail to raise its wilderness area reserved water rights, subsequent adjudication of the latter may be foreclosed by principles of res judicata. *Bell*, at 643.

Secondly, prompt adjudication by the government of its wilderness area reserved water rights could preempt the priority of those prior appropriators, or prior conditional appropriators, who have failed to act expeditiously to protect their interests. Even if the government is a necessary party under the McCarren Amendment, private-party senior appropriators and conditional senior appropriators do not attain any such stature. The government could possibly improve its position relative to senior appropriators through prompt adjudication. Whether this scenario holds promise for Colorado's wilderness areas is indeterminable at this time because the government's plan is wholly devoid of any specific facts concerning the nature of each of the rights held or claimed by the senior appropriators and conditional senior appropriators mentioned in the plan.

■ Finally, and most fundamentally, prompt governmental adjudication of the wilderness area reserved federal water rights would promote the interests of all parties to this lawsuit. The government's suggested approach is characterized by languor and subject to being criticized as irresponsible. In adjudicating reserved federal water rights, the state water court must quantify the precise amount of water needed to fulfill the purposes of the reservation. *Navajo*, at 1379; *Denver*, at 20. No more water is necessary than the amount required to effectuate those purposes.[10] *Navajo*, at 1379. Since I have already undertaken an extensive inquiry of the purposes of the wilderness area reservations, the water courts could readily bring their expertise to bear on adjudicating the exact amount of water necessary to satisfy these purposes.[11] The government and the conservationists would then know just how much water is needed to sustain the wilderness; remaining water would be potentially available for other beneficial uses. Much of the Damoclean uncertainty concerning the allocation of water rights among the interest groups involved in this litigation would disappear.

Nevertheless, despite the promising nature of such a course of action, "I am without power to order the Attorney General to instigate litigation." *Sierra Club I*, at 864. "[T]here simply is no specific legal duty on the part of federal defendants to claim reserved water rights in the wilderness areas in state adjudications." *Id.* Creation of any such duty lies with the Congress.

Plaintiff's current motion for summary judgment is a mere rehash of my prior decision on this point. In *Sierra Club I*, I wrote that "[d]espite Sierra Club's attempts to prove that assertion of reserved water rights is the *only* means by which to

---

**10.** The amount reserved, however, includes any future wilderness area water needs. 86 I.D. at 573, citing *Arizona v. California*, 373 U.S. 546, 600–01, 83 S.Ct. 1468, 1497–98, 10 L.Ed.2d 542 (1963).

**11.** I also observe that "the very nature of a federal reserved water right forecloses resolution of the issues relating to the nature and

extent of the claimed federal right in a factual vacuum." *City and County of Denver v. United States*, 656 P.2d 36, 39 (Colo.1982); *accord Eagle County*, 458 P.2d at 770. The paucity of facts present in the government's plan has resulted in the creation of such a vacuum. The water courts of this state are best equipped to resolve the legal significance of those facts once they have been fully and properly presented.

protect the water resources, I find that the briefs and the administrative record are simply inadequate to fully evaluate this issue." *Id.,* at 865 (emphasis in original).

That statement is just as true today. Sierra Club still presses for prompt adjudication of reserved federal water rights as the *only* acceptable procedure for adequately fulfilling the Forest Service's "general statutory duty to protect wilderness water resources." *Id.,* at 865. The government, on the other hand, has submitted a document which reflects a completely inadequate evaluation of the factors, including the processes described in this opinion, to be considered in determining how best to protect wilderness water resources. Intervenors, meanwhile, persistently combat the very existence of reserved federal water rights in the wilderness areas. The parties are miles apart. No discernible progress has been made since my order of November 25, 1985.

In *Sierra Club I,* I noted:

These federal defendants are required to meet clear statutory obligations. How they meet this responsibility is a matter left to their discretion. Whether they must meet this responsibility is no longer subject to dispute. In remanding this action to the federal defendants, I order them to come forward with a memorandum explaining their analysis, final decision, and plan to comply with their statutory obligations regarding protection and preservation of wilderness water resources.

*Id.,* at 865.

I then remanded the action to the federal defendants "to reevaluate their alternatives, including claiming reserved water rights for the wilderness areas, in complying with their statutory duty to protect wilderness water resources." *Id.,* at 867. The federal defendants were ordered to submit a memorandum "describing their actions on remand and their plan to comply with their statutory duty to protect wilderness water resources." *Id.*

■ The plan submitted in response to this order is woefully inadequate and constitutes an insouciant disregard of the government's statutory responsibility to protect wilderness area federal reserved water rights.[12] In violation of my order of November 25, 1985, the plan does not describe the actions of the agency on remand. I therefore have no way of ascertaining how the agency reached its cursory conclusions. In addition, as related above in detail, the plan gives short shrift to the possible advantages and disadvantages involved in a prompt adjudication of reserved federal water rights in Colorado's wilderness areas. The government has seen fit to adjudicate reserved federal water rights in many, if not all, of the reserved federal lands in Colorado *except* for wilderness areas. *See Denver,* at 20 (government appealed water court decisions relating to reserved water rights in national forests, national monuments, national parks, public springs and waterholes, and mineral hot springs). This omission is entirely unexplained. Finally, the plan is completely deficient in the kind of detail necessary to conduct a satisfactory review of agency action. For example, no facts are provided about the location, date, extent, etc. of any of the individual absolute or conditional water rights mentioned in the plan. Remand is once again necessary, and the possibility of sanctions against the federal defendants now appears on the horizon.

*Rationality of Alternatives*

■ The second portion of the government's plan lists certain alternative methods of protecting wilderness area water resources without seeking an adjudication of the extent of reserved federal water rights. Sierra Club contends these alternatives are so inadequate as to be irrational under the Administrative Procedure Act. Under the plan as it now stands, I agree the alternatives posed present an abuse of discretion under 5 U.S.C. § 706(2)(A).

---

12. I have already examined the nature of my jurisdictional authority to review the government's plan in two orders issued earlier in this case. *See* orders of July 29, 1984 and July 16, 1985. The latter order has been published at 615 F.Supp. 44 (D.Colo.1985).

This portion of the plan suffers from many of the same defects as the first part. Various alternatives are listed in one or two sentences without any explanation of how each alternative would be implemented. What, for example, are the type of "protective conditions" the government could impose under the first alternative? How would enforcement of those conditions be achieved? How will the government decide what stream flow is necessary to sustain the wilderness area ecology such that these protective conditions can even be determined?

Additionally, how would the government decide what diversions outside the wilderness areas are in a position adversely to "affect water resources in a designated wilderness area"? *See* plan alternative numbers 3, 4, 5, 6. What about the specific use of condemnation to alleviate the danger posed by upstream diversions? Or the possibility of using non-reserved federal water rights? What about budget restrictions? What programs would have to be created out of whole cloth, and what currently existing federal entities or programs could be adapted for a relatively trouble-free protection of reserved federal water rights? These questions are merely illustrative. A host of other questions remain either wholly unanswered or incompletely redressed by the listed alternatives.[13] This portion of the plan must also be remanded to the agency.

I recognize that this language is harsh and that people of good motive might be offended by it. Even so, the purported compliance with my orders in *Sierra Club I* is so grossly inadequate as to suggest that those people of good motive and constructive purpose were not successful in promoting a good faith response to those orders. The nature of bureaucracy is such that both benefactors and malefactors are shrouded in anonymity. The views of a court, however, must be exposed for all to see. In that regard let me reiterate my clearly held view: the issues in this case are permeated with conflicting philosophical views and economic interests which properly should be resolved by the political branches of government. While a court can resolve ambiguities and conform executive implementation to legislative intent, it is not the court's business to create policy. Until enlightened by a more precise articulation of legislative policy, it is my intent to enforce with vigor the intent of Congress as I perceive it to be.

Accordingly, IT IS ORDERED that:

1. Intervenors' motion for summary judgment is denied;

2. Plaintiff's motion for summary judgment is granted in part and denied in part. The motion is denied to the extent it seeks a declaratory judgment that reserved federal water rights pose the only acceptable method of protecting the water resources of the Colorado wilderness areas. The motion is granted to the extent it seeks a declaratory judgment that the alternative methods, as currently posed, constitute an abuse of discretion by the agency.

3. The government's current plan is stricken and this action is once again remanded to the agency for action in compliance with the terms of my November 25, 1985 memorandum opinion and order and for action in compliance with the contents of todays' memorandum opinion and order.

4. The government shall submit a plan in compliance with my directives on or before September 1, 1987. In formulating the plan, the government shall accord full consideration to the arguments of, *inter alia,* plaintiff and intervenors or face sanctions of formidable magnitude.

REPORT ON METHODS FOR PROTECTING WILDERNESS WATER RESOURCES ON LANDS ADMINISTERED BY THE FOREST SERVICE, UNITED STATES DEPARTMENT OF AGRICULTURE

This report responds to the order of the United States District Court for the District of Colorado dated November 25, 1985. That order directed the Secretary of Agriculture and Chief of the Forest Service to reevaluate alternatives for the protection

---

**13.** Many such queries could be resolved by a water court adjudication of the exact nature and extent of the reserved federal water rights in the Colorado wilderness areas.

of water resources, including claiming reserved rights for wilderness areas, in complying with their statutory duty to protect the national forest wilderness areas in Colorado as identified in the SECOND AMENDED COMPLAINT in *SIERRA CLUB v. LYNG, et al.*

### Analysis

At the present time, there are no absolute water rights held by others on federal lands within the national forest wilderness areas in Colorado other than those: (1) recognized by Congress, and (2) those that predate the designation of the respective wilderness areas. According to the records of the State Engineer, there are a number of conditional water rights within the designated wilderness areas. Most of these rights are of doubtful validity for failure of their owners to satisfy the diligence requirements of Colorado law. In any event, none of these undeveloped conditional rights could be perfected in a wilderness area without Presidential approval pursuant to 16 U.S.C. 1133(d)(4). Any modification of the existing developments for diversion or storage of water related to the existing absolute rights would be subject to the same requirement.

With regard to the twenty-four identified national forest wilderness areas, a total of four adjudicated absolute rights are on private land and situated in a position to affect wilderness water resources. All of these rights are senior to the respective wilderness designations. A total of three conditional rights are on private land in a position to affect wilderness water resources in the event that their owners attempt to perfect them.

To protect wilderness water resources, the Forest Service has available to it the Wilderness Act, 16 U.S.C. 1131–1136, as well as several other statutes enacted by Congress pursuant to the Property Clause, i.e., the Organic Administration Act of 1897, 16 U.S.C. 473–482, 551 and the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1701 *et seq.* These statutes are potent means of protecting national forests. *City and County of Denver v. Bergland,* 517 F.Supp. 155, 197–208 (D.C.Colo. 1981); aff'd in part, rev'd in part, 695 F.2d 465, 483–484 (10th Cir.1982). The District Court's order of November 25 declared that federal reserved water rights implied under the Wilderness Act exist in the designated Colorado wilderness areas. Because the assertion of federal reserved right claims in ongoing litigation is within the plenary discretion of the Attorney General of the United States, the Forest Service can only recommend that any claims for such rights be asserted. In light of the absence of any identified present threats to wilderness water resources, it is unnecessary for the Forest Service to make any recommendation at this time. However, claiming wilderness reserved rights is at best, only a marginally effective means of protecting national forest wilderness water resources in Colorado. Any reserved right that might ultimately be held to exist would be junior to all rights existing at the time of wilderness designation which includes most of the rights discussed above. In addition, wilderness reserved rights could possibly be subject to the Colorado postponement doctrine, section 37–92–306, C.R.S. 1973, making them junior to virtually all presently adjudicated rights. *See, United States v. Bell,* 724 P.2d. 631 (Colo.1986) (denying reservation date as priority date where claims not filed with original claims pursuant to joinder under the McCarran Amendment, 43 U.S.C. 666).

### Alternatives

As stated above, the Forest Service has not found any present threats of adverse effects upon wilderness water resources that would impair the intent of Congress for the identified wilderness areas in Colorado. However, as with the management and protection of any of the lands and related resources administered by the Forest Service, there are various methods of resource protection available to the agency. Depending upon the factual circumstances presented, the Forest Service can protect wilderness water resources by one or more of the following:

1. Deny or impose protective conditions in any land use authorizations for any activity on National Forest System

land outside of, but in a position to affect, water resources in any designated wilderness area.

2. Recommend to the President protective conditions in or the denial of any authorization for construction of water diversion or storage facilities in a designated wilderness area.

3. Recommend litigation to the Department of Justice in those situations where any activity not amenable to control by land use authorization threatens to adversely affect water resources in a designated wilderness area.

4. Acquire or seek authority to acquire land or water rights where necessary to eliminate any threat of adverse effect upon wilderness water resources.

5. Report to the President for transmission to the Congress, as provided for in the Wilderness Act, 16 U.S.C. 1136, any problems created by future water developments outside of the lands administered by the Forest Service that may adversely affect wilderness water resources.

6. Comment on and recommend the denial or conditioning of any permits, rights-of-way or licenses issued by other federal agencies for water developments that may adversely affect wilderness water resources.

In addition, the Forest Service will maintain communication and coordination with the State of Colorado so that actions taken by the State of Colorado under authority of state water law may complement the protection of wilderness water resources provided by the Forest Service.