12 P.3d 1260

In re SRBA, Case No. 39576—Wilderness Reserved Claims, Consolidated Subcase No. 75–13605 and Hells Canyon National Recreation Area Claims, Consolidated Subcase No. 79–13597.

POTLATCH CORPORATION, A & B Irrigation District, Burley Irrigation District, Twin Falls Canal Co., North Side Canal Co., Harrison Canal Co., Burgess Canal & Irrigation, Peoples Canal & Irrigation, Progressive Irrigation District, Enterprise Irrigation District, New Sweden Irrigation District, Snake River Valley Irrigation District, Idaho Irrigation District, Egin Bench Canal, Inc., North Fremont Canal Systems, Inc., State of Idaho, Dakota Mining Corporation, USMX, Inc., Dewey Mining Company, Thunder Mountain Gold, Inc., Hecla Mining Company, City of Salmon and City of Challis, Appellants,

v.

UNITED STATES of America, Respondent.

Nos. 24546, 24547, 24548, 24557, 24558, 24559.

Supreme Court of Idaho, Boise, February 2000 Term.

Rehearing Granted Nov. 30, 1999.

Oct. 27, 2000.

See also, *U.S. v. City of Challis,* 133 Idaho 525, 988 P.2d 1199.

Givens Pursley, LLP, Boise, for appellants Potlatch Corporation, Dakota Mining Corporation, USMX, Dewey Mining Company, and Thunder Mountain Gold, Inc. Jefferey C. Fereday argued.

Hon. Alan G. Lance, Attorney General, Boise, for appellant State of Idaho. Clive Strong, Deputy Attorney General, argued.

Root & Schindler, P.C., Denver, CO, for appellant Hecla Mining Company. Thomas Root argued.

Ling, Nielsen & Robinson, Rupert, for appellants A & B Irrigation District and Burley Irrigation District. Did not participate in oral argument.

Rolsholt, Robertson & Tucker, Twin Falls, for appellants Twin Falls Canal Company and North Side Canal Company. Did not participate in oral argument.

Rigby, Thatcher, Andrus, Rigby, Kam & Moeller, Chtd., Rexburg, for appellants Har-

rison Canal Company, Burgess Canal & Irrigation, Peoples Canal & Irrigation, Progressive Irrigation District, Enterprise Irrigation District, New Sweden Irrigation District, Snake River Valley Irrigation District, Idaho Irrigation District, Egin Bench Canal, Inc., and North Fremont Canal Systems, Inc. Did not participate in oral argument.

Beeman & Hofstetter, P.C., Boise; Mt. States Legal Foundation, Denver, CO, for appellants City of Salmon and City of Challis. Did not participate in oral argument.

Hon. Betty H. Richardson, United States Attorney, Boise; United States Department of Justice, Washington, DC, for respondent. Sean H. Donahue, United States Department of Justice, Washington, DC, argued.

## ON REHEARING

SCHROEDER, Justice.

This is an appeal from a Snake River Basin Adjudication (SRBA) district court decision granting the United States federal reserved water rights to all unappropriated flows in the Frank Church River of No Return, Gospel–Hump, and Selway–Bitterroot Wilderness Areas, and the Hells Canyon National Recreation Area (HCNRA).

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

The United States Congress passed the Wilderness Act, Pub.L. No. 88–577, 78 Stat. 890 (codified at 16 U.S.C. §§ 1131–1136), in 1964, establishing the National Wilderness Preservation System to be composed of congressionally designated wilderness areas. Nearly four million acres within Idaho have been designated as wilderness under the system, including the Selway–Bitterroot Wilderness Area, designated in 1964, the Gospel–Hump Wilderness Area, designated in 1978, and the Frank Church River of No Return Wilderness Area, designated in 1980. The Hells Canyon National Recreational Area was established in 1975 by the Hells Canyon National Recreation Area Act, Pub.L. No.

94–199, 89 Stat. 1117 (1975) (codified at 16 U.S.C. §§ 460gg(1)-(13)) (HCNRA Act).

The United States filed claims in 1996 for reserved water rights in the Frank Church River of No Return, the Selway–Bitterroot, and the Gospel Hump Wilderness Areas (Subcase No. 75–13605) based on the Wilderness Act.[1] See 16 U.S.C. §§ 1131–1136. The United States also claimed all the unappropriated flows originating in the Hells Canyon National Recreation Area based on the HCNRA Act (Subcase No. 79–13597).[2] See 16 U.S.C. §§ 460gg (1)-(13). Additionally, the United States claimed reserved water rights in the Boise, Payette, Clearwater, Nez Perce, Sawtooth, and Salmon–Challis National Forests under the Multiple–Use Sustained–Yield Act (MUSYA) (Subcase No. 63–25239). See 16 U.S.C. §§ 528–531.

The United States, the State of Idaho and other parties filed cross-motions for summary judgment in each of the subcases. The SRBA district court consolidated Subcase Nos. 75–13605 and 79–13597 along with Subcase No. 63–25239, and issued an order granting in part and denying in part the United States' motions for summary judgment. The SRBA district court ruled that the United States is not entitled to reserved water rights in Subcase No. 63–25239 based on the MUSYA. The decision was affirmed by this Court. United States v. City of Challis, 133 Idaho 525, 988 P.2d 1199 (1999). The SRBA district court held that the United States is entitled to an implied reserved water right to all unappropriated water within the Frank Church River of No Return, the Gospel–Hump, and the Selway–Bitterroot Wilderness Areas based on the Wilderness Act. The SRBA district court's ruling was interpreted by this Court to include all naturally flowing water into the wilderness areas, which would invalidate subsequent appropriations of water granted under state law on water that would otherwise flow into the wilderness areas. Finally, the SRBA district court held that the HCNRA Act expressly reserved all unappropriated flows of water in tributaries to the Snake River originating

---

**1.** Wilderness Act Claims: 75–13605, 75–13606, 77–12774, 77–12775, 77–12776, 81–11191, 82–11120.

**2.** HCNRA Claim: 79–13597.

within the Hells Canyon National Recreation Area.

On rehearing the United States indicates that it does not claim water rights to the mainstem of the Salmon River under the Wilderness Act. However, the United States does make an express reservation of water claim to the mainstem of the Salmon River under the Wild and Scenic Rivers Act. That claim addressed in *Potlatch Corp. and Hecla Mining v. United States,* 134 Idaho 912, 12 P.3d 1256 (2000). The State of Idaho, the City of Challis, the City of Salmon, Potlatch Corporation and a number of other objectors have appealed. This appeal and rehearing only concerns the claims of the United States pursuant to the Wilderness Act and the Hells Canyon National Recreational Area Act.

## II.

### STANDARD OF REVIEW

■ In an appeal from an order granting summary judgment, the Court applies the same standard of review as that used by the district court when originally ruling on the motion. *Mitchell v. Bingham Mem'l Hosp.,* 130 Idaho 420, 422, 942 P.2d 544, 546 (1997). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* The determination is to be based on the pleadings, depositions, and admissions on file, together with the affidavits, if any. *Id.* (quoting I.R.C.P. 56(c)). However, the Court will liberally construe the facts in favor of the party opposing the motion, together with all reasonable inferences from the evidence. *Id.*

## III.

### THE WILDERNESS ACT DOES NOT CREATE IMPLIED WATER RIGHTS.

■ As outlined by this Court in *United States v. City of Challis,* 133 Idaho 525, 988 P.2d 1199 (1999), in order to determine whether there is a basis for a federal reserved water right the Court will assess (1) whether there has been a reservation of land, and, if so (2) whether the applicable acts of Congress contain an express reservation of water, and (3) if not, whether the applicable acts imply a reservation of water. Section 2(a) of the Wilderness Act sets forth the statement of policy which must be considered in this case:

SEC. 2. (a) In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as 'wilderness areas,' and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness; and no Federal lands shall be designated as 'wilderness areas' except as provided for in this Act or by a subsequent Act.

In this case it is unnecessary to determine if there has been a reservation of land since other elements necessary for a reservation of water in the United States do not exist. The Wilderness Act does not expressly reserve water to fulfill any purpose of the Act. The question is whether federal water rights must be implied in the absence of an express reservation in the Act. The United States Supreme Court has discussed the question of reserved water rights in a variety of cases.

In *Winters v. United States,* 207 U.S. 564, 576, 577, 28 S.Ct. 207, 211, 212, 52 L.Ed. 340, 346, 347 (1908), the Supreme Court considered the effect of an agreement between the United States and various Indian tribes whereby the United States acquired considerable property previously held by the tribes. The Supreme Court was interpreting a negotiated agreement intended to provide habitable land for the tribes as they moved from a

nomadic to a pastoral way of life. The Supreme Court determined that there was an implied right to water included in the agreement for the benefit of the land retained by the tribes. To hold otherwise would have meant the tribes gave up a lot of dry land to get a little dry land which was "practically valueless" without irrigation. *Id.* at 576, 28 S.Ct. at 211, 52 L.Ed. at 346. The Court noted that such agreements are interpreted in favor of the tribes, considering the significant difference in bargaining power between the United States and the tribes. The Court found that the implication of a water right followed from the nature of the agreement, the negotiations leading to that agreement, and the interpretation of such agreements and treaties in favor of the tribes. *Id.* at 577, 28 S.Ct. at 212, 52 L.Ed. at 346.

Little about the background and principles of *Winters* is applicable in this case. *Winters* dealt with the creation of a reservation by treaty, a bargained for exchange between two entities. Without the use of water, the purpose of the agreement between the United States and the tribes would be defeated. The land retained by the tribes would not be fit for habitation. In contract terms there would be no consideration for the agreement if the tribes gave up land and did not receive the benefit of water to make the land they retained habitable. To the contrary, the Wilderness Act is not an exchange; it is an act of Congress that sets aside land, immunizing it from further development. There is no principle of construction requiring the Court to interpret the Wilderness Act to create an implied water right. The opposite inference should apply. Congress could define the scope of any water right as it chose. Congress did not define a water right as a specific purpose of the Wilderness Act. "The Supreme Court has held that in cases such as this, where water is not necessary to fulfill the specific purposes of a reservation, there arises a contrary inference that the 'United States would acquire water in the same manner as any other public or private appropriator.'" *United States v. New Mexico,* 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052, 1058 (1978).

In *State of Arizona v. State of California,* 373 U.S. 546, 596–602, 83 S.Ct. 1468, 1495–1499, 10 L.Ed.2d 542, 575–579 (1963), the Supreme Court again dealt with the question of water rights for Indian Reservations. The relevant portion of the decision was in the context of litigation concerning the interpretation and effect of comprehensive Congressional action determining multiple state rights to the waters of the Colorado River. However, the Indian Reservations had been created many years before from arid land that required water to sustain human life. The need for water was apparent at the time the Reservations were created, and the inclusion of water rights was confirmed by Congressional appropriations to finance and maintain irrigating projects. *Id.* at 598, 83 S.Ct. at 1496, 10 L.Ed.2d at 576. Following the logic of *Winters,* the Supreme Court determined that the creation of the Reservations carried with it the need for water to sustain human life on those Reservations. The purpose for the creation of Reservations was clear—to provide habitable land for the Indian tribes. The necessity for water was obvious, as was the case in *Winters.*

In *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), the Supreme Court considered "the scope of the implied-reservation-of-water-rights doctrine." *Id.* at 138, 96 S.Ct. at 2069, 48 L.Ed.2d at 533–534. At issue in *Cappaert,* was "whether the reservation of Devil's Hole as a national monument reserved federal water rights in unappropriated water." *Id.* at 131, 96 S.Ct. at 2066, 48 L.Ed.2d at 529–530. The Presidential Proclamation creating the national monument observed that Devil's Hole "contains a 'remarkable underground pool.'" *Id.* at 132, 96 S.Ct. at 2066, 48 L.Ed.2d at 530. Further, the Proclamation made these statements:

> WHEREAS the said pool is a unique subsurface remnant of the prehistoric chain of lakes which in Pleistocene times formed the Death Valley Lake System, and is unusual among caverns in that it is a solution area in distinctly striated limestone, while also owing its formation in part to fault action; and

> WHEREAS the geological evidence that this subterranean pool is an integral part of the hydrographic history of the Death Valley region is further confirmed by the

presence in this pool of a peculiar race of desert fish, and zoologists have demonstrated that this race of fish, which is found nowhere else in the world, evolved only after the gradual drying up of the Death Valley Lake System isolated this fish population from the original ancestral stock that in Pleistocene times was common to the entire region; and

WHEREAS the said pool is of such outstanding scientific importance that it should be given special protection, and such protection can be best afforded by making the said forty-acre tract containing the pool a part of the said monument....

*Id.*

■ The Proclamation expresses the primary purpose of setting aside Devil's Hole as a monument to preserve the pool and a unique "race of fish which is found nowhere else in the world...." The purpose of the reservation would be defeated if Devil's Hole were deprived of sufficient water to maintain the pool. The need for water is clear from the language of the Proclamation. The Supreme Court explained: "Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created." *Id.* at 139, 96 S.Ct. at 2070, 48 L.Ed.2d at 534. *Cappaert* involved the express reservation of a pool to preserve fish. Because the reservation of the pool was express, the only matter for implication was the amount of water necessary to maintain the pool sufficiently to sustain the fish population. "The implied-reservation-of-water-rights doctrine, however, reserves only that amount of water necessary to fulfill the purpose of the reservation, no more." *Id.* at 141, 96 S.Ct. at 2071, 48 L.Ed.2d at 535.

This Court recognized the principles of *Cappaert* in *United States v. State*, 131 Idaho 468, 959 P.2d 449 (1998), involving Public Water Reserve No. 107, an executive order issued by President Coolidge which withdrew "from settlement, location, sale or entry, and reserved for public use" public land containing "a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land...." *Id.* at 470, 959 P.2d at 451. The executive order was clear on its face that it was intended to protect springs needed for

stockwatering from private monopolization. Consequently, this Court recognized a federal reserved water right for the limited purpose of stockwatering. *Id.* at 472, 959 P.2d at 453.

Neither *Cappaert* nor this Court's decision in *United States v. State* support the claim for a federal reserved right in the Wilderness Act. Each involved a clear intent by the President to reserve water. Congress made no such clear expression of intent in the Wilderness Act.

In *United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), the Supreme Court observed that "[t]he Court has previously concluded that Congress, in giving the President the power to reserve portions of the federal domain for specific federal purposes, *impliedly* authorized him to reserve 'appurtenant water then unappropriated *to the extent needed to accomplish the purpose of the reservation.*'" *Id.* at 699, 700, 98 S.Ct. at 3013, 3014, 57 L.Ed.2d at 1056. The Supreme Court commented: "*Each time this Court has applied the 'implied-reservation-of-water doctrine,' it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated.*" *Id.* at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1057 (emphasis added).

The Supreme Court's analysis continued:

Where Congress has expressly addressed the question of whether federal entities must abide by state water law, it has almost invariably deferred to the state law. See *California v. United States*, 438 U.S., at 653–670, 678–679, 98 S.Ct., at 2990–2998, 3002–3003, 57 L.Ed.2d, at 1024–1035, 1040–1041. Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. *Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views,*

*that the United States would acquire water in the same manner as any other public or private appropriator.*

*Id.* at 702, 98 S.Ct. at 3015, 57 L.Ed.2d at 1058 (emphasis added).

The Supreme Court reviewed the history of the interplay between federal and state rights when land was reserved by the federal government, stating that

[w]hen it was Congress' intent to maintain minimum instream flows within the confines of a national forest, it expressly so directed, as it did in the case of the Lake Superior National Forest:

'In order to preserve the shore lines, rapids, waterfalls, beaches and other natural features of the region in an unmodified state of nature, no further alteration of the natural water level of any lake or stream ... shall be authorized.' 16 U.S.C. § 577b (1976 ed.).

*Id.* at 710, 98 S.Ct. at 3019, 57 L.Ed.2d at 1063.

While the *New Mexico* case dealt with the Multiple Use–Sustained–Yield Act of 1960 rather than the Wilderness Act, the principles set forth are applicable to the question before this Court.

■ Analysis of the claim by the United States begins with the language of the Wilderness Act to determine if implied water rights must be recognized to avoid defeat of the purposes of the Act. There is nothing within the Act that compels that conclusion. Unlike the Presidential Proclamation in *Cappaert* which expressly reserved a pool to maintain a unique variety of fish, the Wilderness Act does not define purposes that necessitate a reservation of water. Similarly, the purpose in *Winters* and *State of Arizona v. State of California* was to provide habitable land to Indian tribes which required that there be enough water for irrigation. Each of the cases decided by the United States Supreme Court involved agreements or a statement by which a standard for quantification could be determined—enough water for human habitation or preservation of a rare fish. There is no standard by which quantification of the amount of water could be determined in the Wilderness Act. Absence of any standard for quantification is indicative of the fact that quantification was not meant to be determined. There is no language in the Wilderness Act compelling the conclusion that there must be reserved water rights to fulfill the purposes of the Act. There is no indication "that without the water the purposes of the reservation would be entirely defeated." *United States v. New Mexico,* 438 U.S. at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1057. The language of the Wilderness Act indicates that it sets aside land and prohibits its development, nothing more.

■ Section 4(d)(6)[3] of the Wilderness Act states that "[n]othing in this Act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws." Wilderness Act § 4(d)(6), 16 U.S.C. § 1133(d)(6). The "no claim or denial" language used in section 4(d)(6) has been included in other congressional acts dealing with the disposition of federal lands. *See, e.g., Sawtooth National Recreation Area Act* § 9, 16 U.S.C. § 460aa–8; *Wildlife Refuge System Administration Act* § 4(i), 16 U.S.C. § 668dd(i); *Wild and Scenic Rivers Act* § 13(b), 16 U.S.C. § 1284(b). In the Wild and Scenic Rivers Act Congress used the "no claim or denial" language and then expressly reserved water in another section of the Act. The language of 4(d)(6) neither establishes a federal water right nor precludes the recognition of such a right if water is otherwise reserved.

The purpose of the Wilderness Act is to prevent the development of land within the designated wilderness areas and to preserve those lands in their natural state for future generations. The Wilderness areas at issue constitute some four million acres in Idaho which receive rain and snowfall. The Wilderness Act protects the land from development. Consequently, springs, creeks and rivers cannot be disturbed while the water is in the wilderness. If the effect of the federal claim to reserved water rights in the wilderness areas were to protect the water while in

---

**3.** This section was originally enacted as section 4(d)(7). The Act of October 21, 1978, Pub.L. No. 95–495, 92 Stat. 1650 (1978), repealed former item (5) of section 4(d) and renumbered the remaining items.

the wilderness, the claim of the United States would be of little consequence. The components of the Wilderness Act that prevent development of the wilderness areas will preclude claimants from tapping into the water while in the wilderness. No implication of a reserved water right is necessary to prevent the withdrawal of water while in the wilderness. The significance of the claim is the effect upon appropriations of water outside the wilderness areas and the effect upon future claims to water rights outside the wilderness areas. If all naturally flowing waters since the designation of the respective wilderness areas were reserved, appropriations made since the wilderness areas were designated would be defeated, and future appropriations of waters that would flow into the wilderness would be precluded. There is nothing within the Wilderness Act that indicates that this is necessary to effectuate the purposes of the Act. Unlike the limitation on appropriation outside the national monument in Cappaert, there is no basis to conclude that the effect of the Wilderness Act was to extend beyond the borders of the wilderness areas.

Well over a quarter of a century passed before the reserved water right claim was made, during which time it is clear that appropriations of water under state law have been made upstream from the wilderness areas. This action is consistent with a review of legislative history which indicates that a reservation of water flowing into the wilderness was not in the contemplation of Congress. Prior to the adoption of the Wilderness Act, Senator Humphrey, who played a key role in the development and passage of the Act, made the following comments concerning Section 4(d)(6) of the Act:

Paragraph 5, the last in this section, contains language vital to colleagues from the West. When the first wilderness bill was being discussed, some of its opponents charged that its enactment would change existing water laws and would deprive local communities of water, both domestic and irrigation. Although this was certainly not the intention of the sponsors, it has seemed necessary to insert a short sentence to remove any doubts. The sentence added says: 'Nothing in this act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.'

104 CONG. REC. 11, 555 (1958).

State laws existing at the time the Wilderness Act was passed, until the present, have allowed the appropriation of water outside the wilderness areas without objection from the federal government. This is consistent with Senator Humphrey's efforts to allay the fears that the Wilderness Act would deprive local communities of domestic and irrigation water. The Senator was seeking to assure people in the West that development could continue outside the wilderness area, not simply assure them that existing water rights would not be taken away.

A statement by Senator Humphrey in 1963 brings more closely into focus the debate that was occurring with regard to wilderness legislation:

During the 8 years in which the proposed legislation has been before Congress, many important modifications have been effected in the specific procedures for identifying and protecting certain areas of wilderness. For example, the proposal to establish a permanent national wilderness preservation council has been eliminated. The original definition of a wilderness area has been modified considerably. The regulations for the protection of wilderness areas have been revised and liberalized. Each of these changes was made because *the proponents of the legislation were determined to seek a bill that recognized the need for wilderness preservation but which did not unduly hamper present land-use programs or legitimate economic, commercial, or commodity uses.*

109 CONG. REC. 5901 (April 8, 1963) (emphasis added).

This statement by the Senator does not directly address the issue before this Court, but it is clearly indicative of the attitude at work in the passage of the Wilderness Act. The creation of the wilderness was not intended to strangle the economic life from areas outside the wilderness.

Senator Frank Church, a strong supporter of the Wilderness Act, made the following

comments in response to statements made during debate:

> Finally, Mr. President, the junior Senator from Colorado has argued that the bill constitutes some sort of impairment with respect to the development of water resources within the areas affected by the bill. He has pointed out, quite correctly, the importance of water impoundments—dams, power generators, and reclamation projects—to the West. But, Mr. President, *I suggest that there are two portions of the bill which adequately assure the West continued water development, and I submit that even within the wilderness system the bill does not constitute any impediment whatever.*

109 CONG. REC. 5892 (April 8, 1963) (emphasis added). Senator Church was speaking of the provisions that would allow the President to authorize some development in a wilderness area and that would allow the Federal Power Commission to license water projects within the wilderness. Clearly, Senator Church anticipated that the west would have "continued water development" above and beyond the authority he recognized to exist with the President and the Federal Power Commission.

A study of the long history of debate over the Wilderness Act leads to the conclusion that Congress could not and would not have passed a bill that implied a water right that would prevent the appropriation of water under state law beyond the boundaries of the wilderness areas. There was no more important person than Frank Church in the development of wilderness legislation. A review of the Frank Church papers brings home the reality that Senator Church would not have advocated or voted for the Wilderness Act but for his understanding that the Act would not cripple the economic growth of portions of Idaho outside the wilderness.[4] The heat of the debate was over the removal from development of land and water resources within the boundaries of the wilderness areas. One cannot accept the idea that in a process as long and intense as the debate leading to the Wilderness Act that Congress

entertained a secret agenda that evaded public scrutiny to defeat the application of state water law outside the wilderness areas. Nor can one believe that Congress relied upon a clear line of Supreme Court authority making it obvious that a water right would be implied. No such line of authority existed, and none has developed since the adoption of the Wilderness Act. In fact, Congress has recognized the need to reserve water in such acts as the Wild and Scenic Rivers Act and the Hells Canyon National Recreation Area Act.

A clear indication of the creation of implied water rights as claimed by the United States does not exist in the language of the Wilderness Act or in its legislative history. To find such an implication hidden within the Act would run contrary to the logic of *Winters, Cappaert, Arizona v. California,* and *United States v. New Mexico.*

The holding of the district court that the Wilderness Act creates an implied water right is reversed.

## IV.

### THE HELLS CANYON NATIONAL RECREATION AREA ACT EXPRESSLY RESERVED WATER TO TRIBUTARIES OF THE SNAKE RIVER ORIGINATING WITHIN THE HELLS CANYON NATIONAL RECREATION AREA, BUT THE SRBA DISTRICT COURT MUST QUANTIFY THE AMOUNT NECESSARY TO FULFILL THE PURPOSE OF THE RESERVATION.

**A. The United States Holds An Express Federal Reserved Water Right to the Minimum Quantity of Water Necessary to Fulfill the Purpose of the Hells Canyon National Recreation Area Act.**

The Hells Canyon National Recreation Area was established in 1975 by passage of the HCNRA Act, Pub.L. No. 94–199, 89 Stat. 1117 (1975) (codified at 16 U.S.C.

---

**4.** The extensive Frank Church papers are housed and catalogued a few blocks from this Court at Boise State University's Albertson's Library. For a published guide see *The Frank Church Papers: A Summary Guide* by Ralph W. Hansen and Deborah Roberts. BSU, 1988. Call number E840.8C49H35.

§§ 460gg(1)-(13)). The "lands and waters" of what is now the HCNRA were withdrawn from the public domain by the HCNRA Act for the purpose of "assur[ing] that the natural beauty, and historical and archeological values of the Hells Canyon area ... are preserved for this and future generations, and that the recreational and ecologic values and public enjoyment of the area are thereby enhanced...." HCNRA Act § 1(a), 16 U.S.C. § 460gg(a).

The designation of the Hells Canyon National Recreation Area under the HCNRA Act constituted a reservation of land. Additionally, Congress expressly reserved water for the HCNRA. Section 1(b) of the HCNRA Act provides:

> The Hells Canyon National Recreation Area (hereinafter referred to as the "recreation area"), which includes the Hells Canyon Wilderness (hereinafter referred to as the "wilderness"), the components of the Wild and Scenic Rivers System designated in section 3 of this Act, and the wilderness study areas designated in subsection § 8(d) of this Act, *shall comprise the lands and waters* generally depicted on the map entitled "Hells Canyon National Recreation Area" dated September 1975, which shall be on file and available for public inspection in the office of the Chief, Forest Service, United States Department of Agriculture. The Secretary of Agriculture (hereinafter referred to as "the Secretary"), shall, as soon as practicable, but no later than eighteen months after the date of enactment of this Act, publish a detailed boundary description of the recreation area, the wilderness study areas designated in subsection 8(d) of this Act, and the wilderness established in section 2 of this Act in the Federal Register.

HCNRA Act § 1(b), 16 U.S.C. § 460gg(b) (emphasis added). The HCNRA Act clearly states that the HCNRA is comprised of the land *and waters* within the area. In reserving waters within the boundaries of the HCNRA, Congress exempted from the reservation the mainstem of the Snake River and all tributaries upstream and downstream from the boundaries of the HCNRA. Section 6 of the HCNRA Act provides:

> (a) No provision of the Wild and Scenic Rivers Act [16 U.S.C.A. §§ 1271 *et seq.*],

nor of this Act, nor any guidelines, rules, or regulations issued hereunder, shall in any way limit, restrict, or conflict with present and future use of *the waters of the Snake River and its tributaries upstream from the boundaries of the Hells Canyon National Recreation Area* created hereby, for beneficial uses, whether consumptive or nonconsumptive, now or hereafter existing, including, but not limited to, domestic, municipal, stockwater, irrigation, mining, power, or industrial uses.

> (b) No flow requirements of any kind may be imposed on the *waters of the Snake River below Hells Canyon Dam* under the provisions of the Wild and Scenic Rivers Act [16 U.S.C.A. §§ 1271 *et seq.*], of this Act, or any guidelines, rules, or regulations adopted pursuant thereto.

HCNRA Act § 6(a) and (b), 16 U.S.C. §§ 460gg-3(a) and (b)(emphasis added).

The disclaimer provisions contained in section 6 apply to the mainstem of the Snake River and to tributaries of the Snake River upstream from the Hells Canyon National Recreation Area and do not include tributaries originating within the Hells Canyon National Recreation Area.

■■■■ Similarly, section 6(b) disclaims a federal reserved water right to "the waters of the Snake River below Hells Canyon Dam." HCNRA Act § 6(b), 16 U.S.C. §§ 460gg-3(b). In sum, the express reservation of water in the HCNRA Act applies only to the tributaries of the Snake River originating in the Hells Canyon National Recreational Area.

**B. The United States Must Quantify the Minimum Amount of Water Necessary to Fulfill the Purpose of the Reservation.**

The purpose of the establishment of the Hells Canyon National Recreational Area is set forth in section 1(a) of the HCNRA Act. That section states that the Hells Canyon National Recreational Area was established:

> [T]o assure that the natural beauty, and historical and archeological values of the Hells Canyon area and the seventy-one mile segment of the Snake River between

Hells Canyon Dam and the Oregon–Washington border, *together with portions of certain of its tributaries* and adjacent lands, are preserved for this and future generations, and that the recreational and ecologic values and public enjoyment of the area are thereby enhanced. . . .

HCNRA Act § 1(a), 16 U.S.C. §§ 460gg 1(a) (emphasis added).

The question presented is what quantity of water is expressly reserved absent any statutory indication? This case falls closest to *Cappaert* in which the President reserved a pool to preserve a rare breed of fish. *See Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). The Supreme Court determined that the reservation carried with it the right to sufficient water in the pool to sustain the fish and fulfill the purposes of the reservation. However, the reservation was limited to "appurtenant water sufficient to maintain the level of the pool to preserve its scientific value and thereby implement Proclamation No. 2961." *Cappaert* at 147, 96 S.Ct. at 2073–2074, 48 L.Ed.2d at 539. the reasoning of *Cappaert* applies to this case.

■ The SRBA district court ruled that the United States holds an express reserved water right to all unappropriated flows originating in tributaries located within the Hells Canyon National Recreational Area with a priority date of December 31, 1975. However, the question of the amount of water necessary to fulfill the purpose of the reservation involves a factual inquiry. The SRBA district court ruled without allowing the parties to develop a factual record. Consequently, the factual determination is not supported by competent evidence.

The SRBA district court's decision as to the existence of an expressly reserved water right is affirmed, but the case is remanded to the SRBA district court for quantification of the amount necessary to fulfill the purposes of the reservation.

## V.

### CONCLUSION

The determination of the SRBA district court that the Wilderness Act impliedly reserved water is reversed. The determination of the SRBA district court that the Hells Canyon National Recreational Area Act expressly reserved water to tributaries originating within the Hells Canyon National Recreational Area is affirmed, but the determination that the reservation includes all naturally flowing water is vacated. The case is remanded to the SRBA district court to determine the amount of water necessary to fulfill the purpose of the reservation in the Hells Canyon National Recreation Area. Costs are awarded to the appellants. No attorney fees are allowed.

Chief Justice TROUT and Justice KIDWELL concur and specially concur. Justices SILAK and WALTERS dissent.

Chief Justice TROUT, specially concurring.

Having now had the opportunity to further examine the federal reserved rights doctrine as it has been asserted in cases involving federal acts other than the Wilderness Act, I have come to question the continued vitality of the doctrine.

The federal reserved rights doctrine was originally developed as a means of determining legislative intent in the absence of any legislative history regarding the intent to reserve water. Because the doctrine is one of implication, the United States Supreme Court has traditionally applied it very narrowly. Additionally, in each case in which the Court has found a federal reserved water right, the particular reservation involved was created prior to the holding in *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), the case in which the doctrine was originally set forth. Because Congress was not yet aware of the potential conflict between state and federal water rights, it was understandable that Congress could have remained silent about the existence of a water right, and yet still intended to reserve water for the purposes of the reservation. Thus, through the holding in *Winters* and its progeny, the United States Supreme Court recognized a federal reserved water right where, had Congress thought about it, it would have believed water was necessary to accomplish the purposes of the reservation.

In the case presently before this Court, however, the reservations at issue were cre-

ated long after the development of the *Winters* doctrine. Thus, I believe we are faced with a situation far different from any other case in which the United States Supreme Court has applied the federal reserved rights doctrine. Given the fact that the Wilderness Act of 1964 was passed almost 60 years after the *Winters* case, and a year after *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), which expressly expanded the doctrine to federal reservations other than Indian reservations, it must be assumed that Congress was aware of the federal reserved water rights doctrine at the time the Act was passed. Therefore, in this case, Congress was aware that conflicts had developed over the issue of water rights for federal reservations of land. Additionally, when Congress passed the Wild and Scenic Rivers Act just a few years later, it included an express reservation of the amount of water necessary to fulfill the purposes of that Act. *See Potlatch Corp. and Hecla Mining v. United States*, 134 Idaho 912, 12 P.3d 1256 (2000); Wild and Scenic Rivers Act, 16 U.S.C. § 1284(c). Thus, it is reasonable to believe that, at the time the Wilderness Act was passed, Congress knew how to create a water right if it believed one was necessary. Where, as in this case, Congress has chosen for whatever reason, not to create an express water right despite its knowledge of a potential conflict, I believe it can no longer be inferred that such a right is necessary to fulfill the purposes of the reservation. Therefore, while I fully concur with the Court's opinion that water is not strictly necessary to accomplish the purposes of the reservation, I believe, under the circumstances of this case, such a result is also mandated by Congress's failure to include an express reservation of water in the text of the Act itself.

Justice KIDWELL, specially concurring.

While I agree with the rationale and the detailed analysis of the majority opinion, I write separately because I believe it is necessary to go further and emphasize that the implied reservation of water rights doctrine should have no application in this case. It is well settled law that the canon of legal construction known as the implied reservation of water rights doctrine is not applicable where the legislation expressly provides for federal exemption from state water law, as is the case here. In reviewing the actual wording of the Wilderness Act, and in conjunction with the stated Congressional intent, it is my opinion that no implied water rights were intended to be reserved by the drafters of the Wilderness Act. Rather, the history, the record, and the words of the Act, amply demonstrate that the intention of the drafters was to expressly disclaim a reservation of water for the named Wilderness Areas.

This express disclaimer was not present in the four cases that gave rise to the legal concept of a federal implied water right. In the cases of *Winters, Arizona, Cappaert* and *New Mexico*, cited by the majority, Congress had failed to provide any express language as to its intent to reserve water. To be precise, *Winters* was based on the Fort Belknap Indian Reservation, ratified by Congress on May 1, 1888, *Arizona* was based on the Colorado River Indian Reservation, created by Congress March 3, 1965, *Cappaert* was based on a Proclamation of the President on January 17, 1952, under the American Antiquities Preservation Act, making it part of the Death Valley National Monument and *New Mexico* was based on the Gila National Forest, established under the Organic Administration Act of 1897. In each, the Court felt it was necessary to create an implication of Congressional intent due to Congress's silence on the issue of reserved water. This legalistic determination of implied water rights has traditionally been employed by the courts *only* when the intent of Congress cannot be discerned from the clear language of the statute. As brought out by the majority, this is not the case in the matter currently before this Court. However, while I agree with the majority that Congressional intent cannot be derived from prior case law, I believe that Congressional intent can be derived from the language of the Act itself.

Section 4(d)(7) of the Wilderness Act provides that "[n]othing in this chapter shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws." Wilderness Act, Pub.L. No. 88–577, 78 Stat. 890, § 4(d)(7) (1964) (codified at 16 U.S.C. § 1133(d)(6)). This section is self evident that Congress was not silent concerning

the issue of reserved water rights, and thus, any application or consideration of the implied reservation of water doctrine is unnecessary.

A review of congressional expressions surrounding this section reveal that there were two primary concerns that were addressed by the addition of section 4(d)(7). First, by adding the word "claim," Congress provided that federal agencies were not exempt from state water laws. Second, by adding "denial," Congress legislated that no existing federal water rights would be changed or denied by the Act.

The history of the Wilderness Act indicates that to alleviate concerns that the Act would interfere with existing state water laws, the California Department of Water Resources recommended a disclaimer be added to the wilderness bill. Senator Neuberger of California proposed the "insertion of an added special section which would provide that 'nothing in this act shall constitute an express or implied claim on the part of the United States for exemption from State water laws.'" 104 CONG. REC. 6344 (1958). In response to California's recommendation, the Department of Justice suggested the bill include the words "or denial" to ensure that none of the then-existing federal water rights would be affected by the passage of the bill. When section 4(d)(7) was finally enacted by the 88th Congress, it contained both the "claim or denial" language. Wilderness Act, Pub.L. No. 88–577, 78 Stat. 890, § 4(d)(7) (1964) (codified at 16 U.S.C. § 1133(d)(6)).

It has been suggested that section 4(d)(7) was put into the Wilderness Act as a means to maintain the status quo of State and Federal water rights at the time of the enactment of the Wilderness Act. This theory, in my opinion, is contrary to the words themselves. However, even if we assume for the discussion that this theory is correct, it does not change the conclusion that the application of the federal reserved water rights doctrine is not appropriate where Congress has expressly discussed, and then refused to reserve, water rights. There has been no precedent cited for the anomalous idea that the application of the federal reserved water rights doctrine is appropriate where the Act establishing the Federal reservation was not silent as the issue of a reservation of water.

In addition to the language of the Act itself, there are an abundance of legislative comments which clearly support the conclusion that section 4(d)(7) was intended as a disclaimer of Federal reserved water rights. Although set out in the majority opinion, I reiterate these comments to amplify the majority's holding and emphasize my points concerning 4(d)(7).

Senator James Murray of Montana stated that "[i]t has been made clear that nothing in the legislation may be construed to modify existing water law." 104 CONG. REC. 11,557 (1958). When Senator Humphrey introduced the revised wilderness bill he noted:

Paragraph 5, the last in this section, contains language vital to colleagues from the West. When the first wilderness bill was being discussed, some of its opponents charged that its enactment would change existing water laws and would deprive local communities of water, both domestic and irrigation. Although this was certainly not the intention of the sponsors, it has seemed necessary to insert a short sentence to remove any doubts. The sentence added says:

Nothing in this act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

104 Cong. Rec. 11, 555 (1958).

In response to criticism of the wilderness bill by one of Colorado's Senators, Senator Frank Church of Idaho stated:

[T]he junior Senator from Colorado has argued that the bill constitutes some sort of impairment with respect to the development of water resources within the areas affected by the bill. He has pointed out, quite correctly, the importance of water impoundments—dams, power generators, and reclamation projects—to the West. But, Mr. President, I suggest that there are two portions of the bill which adequately assure the West continued water development, and I submit that even within the wilderness system the bill does not constitute any impediment whatever.

109 Cong. Rec. 5892 (1963).

This was also the same language used by Senator Church in drafting the Central Ida-

ho Wilderness Act. In an attempt to alleviate fears over federal control of state water, Senator Church emphasized,

> To underscore the jurisdiction of the State of Idaho over the water resources and fish and game within the wilderness areas, the provisions of the 1964 act which relate to these issues are also repeated.

126 CONG. REC. 17,180 (1980).

Senator Church's use of the word "jurisdiction" in connection with the "provisions of the 1964 Act" is particularly significant in determining his understanding of the purpose of section 4(d)(7). Clearly the jurisdiction of the State relates to its ability to regulate the waters found within its borders, not some notion that the State is powerless due to a Court inferred Federal water right.

Therefore, I concur with the majority in the determination that Congress did not intend to reserve a federal water right for the Wilderness Act. This conclusion is supported not only by the rationale contained in cases from the Supreme Court, but also in the express disclaimer contained in section 4(d)(7) of the Wilderness Act.

Justice SILAK, dissenting.

I concur with the section of the majority opinion that holds Congress did not expressly reserve or disclaim a water right in the Wilderness Act. However, I dissent from Section III of the Court's opinion and adhere to this Court's initial determination that the United States holds a federal reserved water right to the wilderness areas designated pursuant to the Wilderness Act. I also dissent, in part, to Section IV. B. of the Court's opinion and adhere to the previous opinion.

A. **The SRBA District Court Properly Determined Congress Implicitly Reserved A Water Right In The Frank Church River Of No Return, The Selway–Bitterroot, And The Gospel–Hump Wilderness Areas Pursuant The Wilderness Act Of 1964.**

This case hinges on the statutory interpretation of the Wilderness Act of 1964 and

whether that Act implicitly reserved a federal water right. The United States Supreme Court has developed the *Winters* doctrine as the method of statutory interpretation regarding water rights for federal reservations. *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908).[5]

The majority opinion discusses the *Winters* doctrine by focusing on the particular circumstances of each case and the United States Supreme Court's application of the doctrine to those circumstances. While not misstating the facts and conclusions of the relevant cases, the Court's analysis is misleading because it lacks a thorough discussion of the *Winters* doctrine itself. Without more, the opinion gives the impression that the United States Supreme Court decided each case individually, without application of a common legal theory. While the majority opinion appears to accept that the *Winters* doctrine applies, there is no discussion of the elements of the doctrine nor any application of those elements to the facts of this case.

The majority opinion ultimately determines the Wilderness Act does not reserve a water right because the purpose of the Act would not be entirely defeated without a reservation of water and states the "purpose of the Wilderness Act is to prevent the development of land within the designated wilderness areas and to preserve those lands in their natural state for future generations." Further, the majority opinion concludes the Act's structure will prevent land-development in the wilderness areas and, therefore, preclude individuals from withdrawing water within the wilderness area, thus no water right is necessary to protect the water within the area. This conclusion is based primarily on the majority interpretation of selective portions of the legislative history of the Wilderness Act.

I disagree with the majority opinion's theory which simply stated is: because the structure of the Wilderness Act prevents development of the land in wilderness areas and, therefore, water will be protected as a natural side-effect of the limits on land-develop-

---

**5.** *See* Karin P. Sheldon, *Water For Wilderness*, 76 Denv. U.L.Rev. 555, 560 (1999) (analyzing the

*Winters* doctrine and providing a complete history of the Wilderness Act).

ment, the federal government does not need a federal water right. The majority uses this theory as a substitute for implying a water right in wilderness areas. Although this is an attractive theory, only the United States Supreme Court may articulate new legal theories regarding federal law. This Court is bound by the precedent as defined by the United States Supreme Court in the *Winters* doctrine and may not avoid the *Winters* doctrine by defining a new theory—namely that no water right is necessary because alternative methods of water protection exist. Moreover, none of the parties has raised this argument; the majority created this theory *sua sponte* instead of simply applying the *Winters* doctrine. The *Winters* doctrine's analysis is clear: if water—not a water right—is essential to fulfill the primary purpose of the federal land reservation, then a water right is granted. The availability of other means of water preservation has never been a part of the *Winters* doctrine.

In both *Sierra Club v. Block* and *Sierra Club v. Lyng,* a federal district court addressed the argument of whether the federal government is required to assert a claim for water rights in wilderness areas if alternative means for protecting water exist. *Sierra Club v. Block,* 622 F.Supp. 842, 863 (D.Colo. 1985); *Sierra Club v. Lyng,* 661 F.Supp. 1490 (D.Colo.1987) (reversed on other grounds by *Sierra Club v. Yeutter,* 911 F.2d 1405 (10th Cir.1990)). In those cases, the court was faced with the Sierra Club's argument that the federal government's failure to assert its rights violated the government's duty to`protect the water pursuant to administrative regulations and the common law public trust doctrine. The court there determined it could not order the federal government to assert a claim but did order the government to submit a detailed plan of its alternative methods of water protection.

In this case, the federal government has brought a claim for water rights pursuant to the Wilderness Act. Neither party has argued the federal government was required to assert a claim, as in the *Sierra Club* cases, nor has either party claimed land-development restrictions were an alternative method of water protection sufficient to substitute for a water right. Instead, the federal government is asserting its right to water in wilder-

ness areas pursuant to the *Winters* doctrine. The *Winters* doctrine does not allow for an alternative theory of water protection to substitute for a implied water right. The doctrine is instead a method of statutory interpretation for determining whether Congress has expressly or implicitly reserved a water right. This Court is bound to the *Winters* doctrine and may not deviate from it by proposing its own novel theory of federal law.

The *Winters* doctrine is a judicial doctrine enunciated by the United States Supreme Court not as guidance or a mere recommendation to state courts, but as binding precedent on all lower courts, including this Court. State courts are required to follow the doctrine as detailed by the United States Supreme Court in *Winters* and its line of cases. This Court has followed the *Winters* doctrine in at least two previous cases. *See United States v. City of Challis,* 133 Idaho 525, 988 P.2d 1199 (1999); *see also United States v. State,* 131 Idaho 468, 959 P.2d 449 (1998). It is inappropriate for this Court to now redesign or otherwise ignore a long-standing doctrine of the United States Supreme Court. *See Block,* 622 F.Supp. at 852 (The existence of this doctrine is now well-established as a matter of federal law.). In this case, the Idaho Supreme Court has not been called upon to interpret Idaho's Constitution or laws, but rather to make a determination under federal law. This Court has recognized the long-standing principle that the ultimate responsibility for interpreting federal law rests with the United States Supreme Court and therefore its holdings are binding on all other state and federal courts. *See State v. Holtslander,* 102 Idaho 306, 309, 629 P.2d 702, 705 (1981). This concept is not novel or unique to Idaho. The Colorado Supreme Court has also held:

> Under the Supremacy Clause of the United States Constitution ... it is our duty to adhere to the principles of federal law that have been enunciated by the United States Supreme Court ... and take cognizance of the holdings of the United States Supreme Court that articulate the basic principles of the reserved water rights doctrine.

*United States v. City and County of Denver,* 656 P.2d 1, 16 (1982) (citations omitted). I

see no reason to deviate from this principle in this case. Accordingly, United States Supreme Court authority is binding upon this Court.

Although the majority opinion discusses the *Winters* doctrine, I am compelled to include my own analysis of the doctrine because the majority's discussion of the history and application of the *Winters* doctrine is misleading.

### 1. The *Winters* Doctrine.

While states generally have plenary control over water located within their boundaries, the United States may claim a federal reservation of water appurtenant to federally reserved land pursuant to the Commerce Clause, Art. I, § 8, the Property Clause, Art. IV, § 3, and the Supremacy Clause, Art. VI, cl. 2. *See Kansas v. Colorado,* 206 U.S. 46, 86, 27 S.Ct. 655, 662, 51 L.Ed. 956, 970 (1907). A claim by the United States to a federal reserved water right is an exception to a state's plenary authority over its water. *See Winters,* 207 U.S. at 577, 28 S.Ct. at 211–212, 52 L.Ed. at 346–347. Federal reservation of a water right may be either express or implied. *See United States v. New Mexico,* 438 U.S. 696, 699–700, 98 S.Ct. 3012, 3013–3014, 57 L.Ed.2d 1052, 1056–1057 (1978). In the absence of an express reservation of water by an Act of Congress, courts must consider whether Congress implicitly reserved a water right pursuant to the federal reservation of water rights doctrine, first recognized by the United States Supreme Court in *Winters* and later interpreted in *Cappaert. See Winters,* 207 U.S. at 576, 28 S.Ct. at 211, 52 L.Ed. at 346; *see also Cappaert v. United States,* 426 U.S. 128, 139, 96 S.Ct. 2062, 2069–2070, 48 L.Ed.2d 523, 534–535 (1976).

In *Winters,* the United States Supreme Court addressed whether the federal government implicitly reserved rights to water located on the Fort Belknap Indian Reservation. The Court held that when Congress created the Indian reservation it not only set aside land, but also impliedly reserved the water rights necessary to fulfill the purposes of the reservation. *See Winters,* 207 U.S. at 576–77, 28 S.Ct. at 211–12, 52 L.Ed. at 346–47 (determining that without water, the land would be useless and the purpose of the reservation would be defeated). The effect of *Winters* was to superimpose a judicially implied federal water right on a state's system of water appropriation.

The doctrine was more fully explained in a later case in which a federal reservation—this time a national park—was created to preserve certain pools containing a rare fish. *See Cappaert,* 426 U.S. at 129, 96 S.Ct. at 2065, 48 L.Ed.2d at 529.

> This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing, the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators.... The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams.

*Id.* at 138, 96 S.Ct. at 2069, 48 L.Ed.2d at 534 (citations omitted). The Court in *Cappaert* further stated:

> In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water. Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created.

*Id.* at 139, 96 S.Ct. at 2070, 48 L.Ed.2d at 534 (citations omitted). The Court went on to determine the purpose of the national park—to protect the area and all that is in it for future generations—"is meaningful only if the water remains" and, therefore, held that Congress intended to retain a water right when it reserved the area. *Id.* The Court noted that the implication of a reserved right is not without limitation since "[t]he implied-reservation-of-water-rights doctrine ... reserves only that amount of water necessary to fulfill the purpose of the reservation, no more." *Id.* at 141, 96 S.Ct. at 2071, 48 L.Ed.2d at 535 (citing *State of Arizona v.*

*California,* 373 U.S. 546, 600–01, 83 S.Ct. 1468, 1497–98, 10 L.Ed.2d 542, 578–79 (1963)).

The United States Supreme Court next interpreted the *Winters* doctrine in the context of national forest reservations. *See New Mexico,* 438 U.S. at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1056. The Court stated that "[w]here water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude . . . that the United States intended to reserve the necessary water." *Id.* at 702, 98 S.Ct. at 3015, 57 L.Ed.2d at 1058. In *New Mexico,* the Court further limited implication of a reserved water right to only those situations where water was necessary to fulfill the "primary" purpose of the reservation. *Id.* at 702, 98 S.Ct. at 3015, 57 L.Ed.2d at 1058. The Court held that if "water is only valuable for secondary use of the reservation . . . there arises the contrary inference that Congress intended . . . that the United States would acquire water in the same manner as any other public or private appropriator." *Id.* The Court stated that the necessity of water must be so great that without the water the reservation would be "entirely defeated." *Id.* at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1057. Ultimately, the Court's holding determined that the primary purpose of the national forest reservation, at issue, which was to protect the watershed and provide a continual timber resource, did not include a water right for the secondary purposes, such as recreation, asserted under Multiple–Use–Sustained–Yield–Act of 1960. *See id.* at 707–709, 98 S.Ct. at 3017–3019, 57 L.Ed.2d at 1061–1062.

The *Winters* doctrine has been expanded to include not only Indian reservations, but also other federal land reservations such as national recreation areas, national forests, and wildlife refuges. *See Arizona v. California,* 373 U.S. at 601, 83 S.Ct. at 1498, 10 L.Ed.2d at 578 (finding the same analysis underlying the reservation of water rights for Indian reservations is applicable to other federal reservations). In *New Mexico,* the Court made clear that the *Winters* doctrine "applies to all federal enclaves" which have been properly reserved for a specific federal purpose. *See also Lyng,* 661 F.Supp. at 1494 (quoting *United States v. Denver,* 656 P.2d at 20).

Congress retains an undiminished right to reserve unappropriated water necessary for lands withdrawn and reserved for a specific federal purpose indefinitely. The U.S. Supreme Court stated in *New Mexico:*

> [W]hatever powers the States acquired over their waters as a result of congressional Acts and admission into the union, however, Congress did not intend thereby to relinquish its authority to reserve unappropriated water in the future for use on appurtenant lands withdrawn from the public domain for specific federal purposes.

*New Mexico,* 438 U.S. at 698, 98 S.Ct. at 3013, 57 L.Ed.2d at 1056 (citing *Winters,* 207 U.S. at 577, 28 S.Ct. at 211, 52 L.Ed. at 346). Congress is not bound to the original federal purpose for the reservation but is free to redesignate the withdrawn land for different uses without relinquishing its authority. *See, e.g., United States v. Denver,* 656 P.2d at 30–31 (national forest land re-reserved as a national park); *Arizona v. California,* 373 U.S. at 601, 83 S.Ct. at 1498, 10 L.Ed.2d at 578 (finding implied water rights in a recreation area previously reserved for a water project).

The practical effect of the majority's misapplication of *Winters* is the extinction of the doctrine of implied water rights. The majority's analysis is so restrictive that it eliminates the "implied" aspect of the *Winters* doctrine and leaves no room for any Act of Congress to ever imply a "water" right. According to the majority's holding in this case, expressed water rights will only be recognized when an Act of Congress specifically states that water is to be reserved, as was done in the Hells Canyon National Recreation Area Act. Consequently, the majority has taken the position that it will not recognize an implied reservation by Congress in the absence of anything less than an express clause reserving water. The ultimate result in Idaho is that there will only be either expressed reservations or no reservation; thus, the United States Supreme Court's holding in *Winters* and its line of cases, that water rights may be either expressed or implied, will no longer be recognized in Idaho.

The majority's conclusion that the purpose of the Wilderness Act does not require water

rests, in part, on the conclusion that the Wilderness Act does not provide a standard for quantification like the *Winters* line of cases. The majority states:

> Unlike the Presidential Proclamation in *Cappaert* which expressly reserved a pool to maintain a unique variety of fish, the Wilderness Act does not define purposes that necessitate a reservation of water.

However, it is not necessary that the reservation "expressly reserve a pool" in order to reserve a water right. If that were true, there would never be an implied water right. It is not for this Court to determine whether the doctrine of implied water rights should be maintained; rather, we are to apply the doctrine as defined by the United States Supreme Court. The majority states that the purposes in *Winters* and *Arizona* was to provide habitable land to Indian tribes, and that purpose necessitated water. The Court concluded that the purposes in *Winters* and *Arizona* sufficiently stated a standard for quantification while the Wilderness Act's purpose of protecting and preserving the wilderness did not amount to a standard for quantification.

Regardless of whether a standard for quantification exists, the issue of whether Congress intended to reserve a water right should focus on the purpose of the act, not whether a standard for quantification exists. Quantification need not be determined until after a water right is deemed to exist.

In order for this Court to determine whether an Act of Congress has reserved a water right in federally owned lands consistent with the *Winters* doctrine, the Court must determine: 1) whether there has been a reservation of land; and 2) if so, whether the applicable Act of Congress contains an express reservation of water; and 3) if not, whether the applicable Act implies a reservation of water under the implied reservation of water rights doctrine. *See City of Challis*, 133 Idaho at 529–30, 988 P.2d at 1203–04. An implied reservation exists where it is clear that Congress "intended to reserve"

unappropriated water. *See Cappaert*, 426 U.S. at 139, 96 S.Ct. at 2070, 48 L.Ed.2d at 534. Intent to reserve water will be inferred if water is necessary for the primary purposes of the reservation and if, without water, the purposes of the reservation will be entirely defeated. *See New Mexico*, 438 U.S. at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1056. In this case, the issue of implied reservation must be addressed in two steps; first, ascertaining the primary purpose of the Wilderness Act and second, determining whether water is necessary such that this purpose would be entirely defeated without water.[6]

### 2. The primary purpose of the Wilderness Act is to preserve and protect wilderness areas.

To determine the purpose of the Wilderness Act, it is appropriate to consider: 1) the language of the Act itself and any other relevant legislation, as well as the 2) the Wilderness Act's legislative history.

#### a. Text of the Wilderness Act and other relevant legislation.

With regard to the language of the Act itself, a plain reading of the words of the Wilderness Act shows Congress intended to reserve a water right in wilderness areas to fulfill the primary purpose of the Act because, without water, the purpose of the reservation would be entirely defeated. Prior to enactment of the Wilderness Act, national forest land was administered under the Organic Administration Act of 1897 and wilderness purposes were protected in the national forests only as a matter of administration. In order to provide permanent heightened protection to wilderness areas, Congress passed the Wilderness Act of 1964 establishing the National Wilderness Preservation System in order to set aside and preserve certain wilderness areas and provide for future designation of additional areas. The purpose of the Wilderness Act is to provide long range planning for wilderness areas in

---

6. Although the McCarran Act, 43 U.S.C. § 666(a) (1994), enables states to join the federal government in water rights general adjudications, the Act is fundamentally flawed in that state courts are unable to certify a question of controlling federal law to the federal courts. While state courts are certainly competent to interpret federal law, the ability to submit a question of constitutional or federal statutory interpretation to a federal court would result in nationwide consistency and binding precedent.

934

order to preserve and protect the wilderness character of the reserved areas, and to fulfill other preexisting purposes. *See* 16 U.S.C. §§ 1131–1136; *see also Block*, 622 F.Supp. at 849–850. The Wilderness Act's stated purpose is to:

[S]ecure for the American people of present and future generations the benefits of an enduring resource of wilderness ... for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness....

§ 2(a). "Wilderness" is "an area where the earth and its community of life are untrammeled by man ... retaining its primeval character and influence ... which is protected and managed so as to preserve its natural conditions...." § 2(c). Congress further stated the use of wilderness areas "shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." § 4(b). A plain reading of the Act as a whole reveals the primary purpose of the Wilderness Act is to set aside certain designated areas and preserve their untouched wilderness character, not merely to prevent land development as the majority concludes. *See Block*, 622 F.Supp. at 855. These provisions also make clear that any purposes previously applicable to certain areas continue to exist in wilderness areas, but that those purposes must serve and further the overriding purpose of wilderness preservation.

Most areas designated as wilderness areas under the Wilderness Act were lands formerly reserved as national forests. In *New Mexico*, the United States Supreme Court recognized that Congress implicitly reserved a water right in national forests to the extent necessary to provide a continual supply of timber. *See New Mexico*, 438 U.S. at 711, 98 S.Ct. at 3019, 57 L.Ed.2d at 1063. The Court, however, refused to recognize an expanded water right to national forest areas pursuant to MUSYA because the MUSYA purposes were secondary to the primary purpose of the reservation as a national forest.

It is strange to conclude that because these same lands have now been re-reserved under an Act providing heightened protection to wilderness areas, they have somehow lost the water rights they possessed as a national forest.

The Wilderness Act differs from the situation in *New Mexico*. *See Block*, 622 F.Supp. at 859–61. The court in *Block* determined the Wilderness Act is not a land-management statute, nor does the Act seek to add to the primary purpose of existing reservations, as in *New Mexico*. The Wilderness Act is instead original legislation reserving wilderness areas. *See id.* It may appear that the purposes of national forests and the Wilderness Act are inconsistent. However, the conservation and recreational purposes of the Wilderness Act are consistent with the purposes of conserving water flow. *See id.* In passing the Wilderness Act, Congress intended to incorporate the national forest purposes:

Congress also sought to carry over and maintain the purposes for which the national forests had been established. All of the above stated purposes were deemed by Congress "to be within and supplemental to the purposes for which national forests ... are established and administered ...." 16 U.S.C. § 1133(a). Further, Congress stated that "[n]othing in this chapter shall be deemed to be in interference with the purpose for which national forests are established ...." 16 U.S.C. § 1133(a)(1). As discussed previously, the Supreme Court has determined that the primary purposes for which national forests were created were to "conserve water flows, and to furnish a continuous supply of timber ...." *New Mexico*, 438 U.S. 696, 707, 98 S.Ct. 3012, 3017, 57 L.Ed.2d 1052, 1061 *citing* 30 Cong.Rec. 967 (1897) (statement of Rep. McRae).

*Id.* at 859.

The Wilderness Act is also distinct from the situation in *New Mexico* because each of the purposes surrounding the Wilderness Act were intended by Congress to be primary and crucial and, therefore, entitled to a water right unlike the secondary MUSYA purposes. *See id.* One such primary purpose is water-

shed protection and the conservation of water flows. *See id.* It is clear Congress intended to protect the watersheds and preserve water flows for downstream use as well as preserving the character of the wilderness and providing for recreation. Such water protection is not contrary, but instead consistent with wilderness preservation because such preservation "enhances water quality and quantity." *See id.* at 859. As the *Block* court stated:

> [P]reservation of wilderness areas in their natural state actually enhances water quality and quantity. By protecting the natural state of the watersheds ... wilderness areas improve the availability, as well as the purity, of the water for downstream users.

*Id.* (citing S.R. Rep. No. 109, 88th Cong., 1st Sess. at 15 (1963) (wilderness areas "provide watershed protection and clear, pure water for users below them")).

In *New Mexico,* the United States Supreme Court determined that national forest reservations had only a limited purpose, and therefore only a limited water right, but indicated that the broader purpose of the national parks, which is similar to the Wilderness Act's purpose, does imply a broader reservation of water.

> Any doubt as to the relatively narrow purposes for which national forests were to be reserved is removed by comparing the broader language Congress used to authorize the establishment of national parks .... Congress created the National Park Service and provided that the "fundamental purpose of the said parks, monuments, and reservations ... is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same ... unimpaired for future generations."

*New Mexico,* 438 U.S. at 708–09, 98 S.Ct. at 3018–19, 57 L.Ed.2d at 1061–62 (citing National Park Service Act of 1916, 39 Stat. 535, § 1, as amended, 16 U.S.C. § 1 (1976 ed.)). The Court recognized that where a narrow purpose is proposed by a Congressional Act, as with national forests, that Congress would expressly reserve the water needed and, therefore, there were no implied water rights. However, where Congress specifies a broad purpose, as with national parks, Congress implicitly reserved that amount of water necessary to effectuate the broad purpose. *See id.* at 710–711, 98 S.Ct. at 3019–20, 57 L.Ed.2d at 1063–64. This same analysis should apply to wilderness areas because the Wilderness Act's purpose more closely resembles the purpose of national parks rather than national forests.

Further, when reviewing the two additional Acts of Congress designating the areas in Idaho, it becomes clear Congress intended to reserve water for the primary purpose of preserving the wilderness character of the areas reserved. The Selway–Bitterroot wilderness area was reserved by the Wilderness Act of 1964. The Gospel–Hump Area was reserved as a part of the Endangered American Wilderness Act of 1978, which was an effort by Congress to:

> [P]reserve such areas as an enduring resource of wilderness which shall be managed to promote and perpetuate the wilderness character of the land and its specific multiple values for watershed preservation ....

Endangered American Wilderness Act of 1978, Pub.L. No. 95–237 § 1(b), 92 Stat. 40 (1978). Section 4(c)(1) of that Act specifically references the Gospel–Hump Area and mandates cooperation of federal and state agencies to conduct a:

> [C]omprehensive fish and game research program within the Gospel–Hump Area and surrounding Federal lands in north-central Idaho ... this research program includes detailed investigations concerning resident and anadromous fisheries resources (including water quality relationships) and the status ... of game populations, in order to provide findings and recommendations concerning integration of land management and development with the protection and enhancement of these fish and game resources.

*Id.* at § 4(c)(1). It would be pointless for Congress to mandate a research program for management of fisheries if the federal government had no right to the water in the area. Later, in the Central Idaho Wilderness Act of 1980, Congress designated the River of No Return Wilderness Area (later named the Frank Church River of No Re-

turn Wilderness Area) as a protected wilderness area. *See* Central Idaho Wilderness Act of 1980, Pub.L. No. 96–312, 94 Stat. 948 (1980). In this Act, Congress also specifically addressed the importance of water to the fish and wildlife in the designated areas.

> [T]hese wildlands and a segment of the Salmon River should be incorporated within the National Wilderness Preservation System and the National Wild and Scenic Rivers System in order to provide statutory protection for the lands and waters and the wilderness-dependent wildlife and the resident and anadromous fish which thrive within this undisturbed ecosystem.

*Id.* at § 2(a)(2). The Act goes on to specify that its purpose is to further the purposes of the Wilderness Act of 1964 by setting aside specific wilderness areas; moreover, the Act makes specific river designations as included in the wilderness area. *See id.* at § 9(a) (amending the Wild and Scenic Rivers Act to include certain portions of the Salmon River to be reserved). *See Potlatch Corp. and Hecla Mining v. United States of America,* 134 Idaho 912, 12 P.3d 1256 (2000).

### b. Legislative history of the Wilderness Act.

The majority opinion relies on legislative history as determinative of the purpose of the Act. The majority cites, in particular, to statements from Senators Humphrey and Church as standing for the proposition that the Wilderness Act was intended to preserve only land, not water. However, the Congressional Records also contain statements from Senator Church indicating his interest in preservation of both land and water:

> If we do not act now to conserve our vanishing wilderness, it will soon be lost forever. The wilderness not only is important to those who love the outdoor life and the sportsmen who hunt and fish there; it is equally needed for nature studies and general scientific inquiry, and for wise watershed and wildlife conservation.

109 Cong. Rec. 5942 (1963) (statement of Sen. Church). Senator Church further stated:

> [O]ne of the purposes of the proposed legislation is to prevent a further opening up of the area, ... so that the scenic and wilderness values, which are the predomi-

nant values, can be preserved, and so that the wildlife and the watershed can be preserved as well.

109 Cong. Rec. 5895 (1963) (statement of Sen. Church).

Statements by other Senators and members of Congress make it clear that Congress's purpose in establishing a wilderness preservation system was to protect all natural features contained in the wilderness areas, including water, and to "guarantee ... that these lands will be kept in their original untouched natural state." 110 Cong. Rec. 17448 (1964) (statement of Rep. Cleveland). Moreover, the reason Congress promulgated the Wilderness Act was to "preserve for present and future generations, land in its original state to be used and enjoyed by all who are interested in outdoor life and conservation." 110 Cong. Rec. 17437 (1964) (statement of Rep. Riehlman). It is clear Congress intended to include water as a necessary element in the preservation of wilderness areas when it stated in the Conference Report that wilderness areas "provide watershed protection and clear, pure water for users below them." S.R. Rep. No. 109, 88th Cong., 1st Sess. at 15 (1963).

Legislative history is a difficult method of statutory interpretation to employ. Where an Act of Congress clearly identifies its purpose, delving into legislative history may confuse the plain reading of the law. In resorting to legislative history in the face of clear statutory language, a judge is likely to "put into [the legislature's] mouth things which he thinks it ought to have said." L. Hand, How Far Is A Judge Free In Rendering A Decision? In The Spirit Of Liberty 106, 108, 109 (I. Dillard 2d ed.1954). Often, especially in the case of the United States Congress, the legislative history is so voluminous that a court can manipulate the meaning of a law by choosing certain portions to emphasize. *See Matter of Sinclair,* 870 F.2d 1340 (7th Cir. 1989). Furthermore, legislative history consists of several different types of committee transcripts and reports. Each of the various types of legislative history are afforded different weight based on their relative credibility. *See* 2A N. Singer, *Sutherland Statutory Construction* §§ 48.01 *et seq.* (4th ed.1984).

Congressional committee reports receive greater weight than an individual legislator's comments made in the course of debate. *See id.*

Statutes are law, not evidence of law, and statements in the legislative history that purport to show how members of Congress intended or expected the plain language of the statute to be applied on given facts are not binding on an interpreting court. *See* Report to the Attorney General, Using and Misusing Legislative History: A Re–Evaluation of the Status of Legislative History in Statutory Interpretation, U.S. Dept. of Justice iv. (1989). "The legislative history of [a statute] is ambiguous .... Because of this ambiguity it is clear that we must look primarily to the statutes themselves to find the legislative intent." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 412 n. 29, 91 S.Ct. 814, 821 n. 29, 28 L.Ed.2d 136, 151 n. 29 (1971).

The most compelling reason to limit our analysis to the text of the Wilderness Act itself is the structure of the legislative process in this country. The Constitution requires not only agreement on the language of legislation between both houses of Congress, but also that bills be presented to the President and subject to veto. This demonstrates that the focus of a court's statutory interpretation must center on ascertaining the meaning of the statute from the text itself. *See* Report to the Attorney General, Using and Misusing Legislative History *supra.* "It is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means." *Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490, 505 (1988) (Scalia, J.); *see also* Holmes, The Theory of Legal Interpretation, 12 Harv. L.Rev. 417, 419 (1899) ("We do not inquire what the legislature meant; we ask only what the statute means."). When ascertaining the meaning of a statute, judges exercise the proper judicial power of interpretation when they work with the actual words of the enacted statute, which are the law—not statements made by members of Congress intended to persuade others to vote for or against a given bill.

### 3. The primary purpose of the Wilderness Act would be entirely defeated without water.

The second step in ascertaining whether Congress implicitly reserved a water right is the determination of whether the primary purpose of the Act would be entirely defeated without water. *See New Mexico,* 438 U.S. at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1056. I can see no way to retain the wilderness character of an area without water. Where the primary purpose is to establish an area "untrammeled" and "untouched" by man, it would seem useless to merely limit man's direct physical impact on the land by limiting man's use of the land while, at the same time, depriving the wilderness and all that live there of water, which keeps it alive. The importance of water to wilderness areas was also noted in a recent law review article:

Water is integral to wilderness, essential to sustaining the communities of life that exist within the boundaries human beings draw around wild places. Without the full measure of its naturally occurring water, a wilderness will change; deprived of water it will die.

Karin P. Sheldon, *Water for Wilderness,* 76 Denv. U.L.Rev. 555 (1999). The article concluded that while the law may be able to "sever water from land for purposes of allocating rights of use" no one can "sever land from its need for water, or even lessen the critical role that water plays in sustaining life." *Id.* at 590. I agree.

Congress set aside the areas in question to preserve their wilderness character. Although the wilderness is generally a non-consumptive user of water in its streams and lakes, water is still necessary for wilderness protection. Thus it is necessary that the federal government possess a right to the water in the area in order to fulfill the primary purpose of the Wilderness Act. Without water no wilderness, or the vegetation, animals, and fish within it can survive. Just as the Indian reservations in *Winters* and *Arizona* were useless without water, the wilderness areas and all that reside or grow in them would cease to exist if deprived of water. In both *Winters* and *Arizona,* Congress set aside land for Indian reservations

but did not expressly retain a water right in the land, nor did Congress need to. The United States Supreme Court determined the purpose of the areas as Indian reservations was defeated without water and, therefore, Congress must have implicitly reserved sufficient water to make the land useful. The same is true here.

Wilderness areas may not contain an express reservation of water by Congress, but the areas will never retain their "wilderness character" without water. These areas are to be preserved unchanged, but a change in the flow of streams would change their wilderness character. Therefore, Congress implicitly reserved sufficient water to fulfill the purpose of the Wilderness Act just as it did in the both the Indian reservations considered in *Winters* and *Arizona*. Further, the doctrine of implied water rights is not limited to only Indian reservations but encompasses any "enclave" where Congress has reserved an area for a specific purpose. *See Lyng*, 661 F.Supp. at 1494; *see also Arizona*, 373 U.S. at 601, 83 S.Ct. at 1498, 10 L.Ed.2d at 578 (determining the doctrine is not limited to Indian reservations but has been expanded to other federal land reservations).

The only other court to have squarely addressed the issue of whether the Wilderness Act implied a federal water right in reserved wilderness areas is the Federal District Court for the District of Colorado. *See Block*, 622 F.Supp. at 855. In that case, the federal court examined the Wilderness Act in relation to a suit brought by the Sierra club against the United States Forest Service for failing to assert a claim for water rights in several wilderness areas in Colorado. The court's analysis focused on "specific provisions of the Wilderness Act" and the relevant legislative history. *See id.* In *Block*, the court's determination of whether the Wilderness Act intended to reserve water centered around a full discussion of the *Winters* doctrine and, in light of that doctrine, an analysis of the text of the Wilderness Act. The court also quoted certain remarks from the legislative history as support for its interpretation of the text. The court then concluded that:

> Congress intended to reserve previously unappropriated waters in the wilderness areas to the extent necessary to accom-

plish these purposes. It is beyond cavil that water is the lifeblood of the wilderness area. Without water, the wilderness would become deserted wastelands. In other words, without access to the requisite water, the very purpose for which the Wilderness Act was established would be entirely defeated. Clearly, this result was not intended by Congress. Accordingly, under the implied-reservation-of-water doctrine, it is implied from the Wilderness Act that Congress reserved water rights in the wilderness areas to the extent necessary to accomplish the purposes specified in the Act. Thus, ... federal reserved water rights do exist in previously unappropriated water in each of the ... wilderness areas designated as such pursuant to the Wilderness Act ....

*Id.* at 862. This was the same analysis and conclusion reached by this Court in its original opinion to this case, with which I still agree.

In sum, it is not for this Court, nor any court, to make or change the law, but to interpret the law as enacted by the legislative branch. Until Congress enacts further legislation clarifying the Wilderness Act as to federal reserved water rights, or otherwise resolves this issue, courts must apply the *Winters* doctrine to resolve these disputes. In applying the *Winters* doctrine, some states will recognize an implied federal water right via the Wilderness Act and some states will not, resulting in a patchwork of different interpretations of the same federal statute across the country. I agree with the court in *Lyng* who stated:

> The issues in this case are permeated with conflicting philosophical views and economic interests which properly should be resolved by the political branches of government .... Until enlightened by a more precise articulation of legislative policy, it is my intent to enforce with vigor the intent of Congress as I perceive it to be.

*Lyng*, 661 F.Supp. at 1502.

I would hold there is an implied federal reserved water right in wilderness areas pursuant to the Wilderness Act whose primary purpose is to maintain wilderness areas in their pristine natural condition because, without water, that purpose would be entirely defeated.

**B. The SRBA District Court Properly Held A Federal Reserved Water Right Exists For All Unappropriated Flows Of Tributaries To The Snake River Originating Within The HCNRA.**

The SRBA district court concluded the United States holds a federal reserved water right to all unappropriated flows originating in tributaries located within the Hells Canyon National Recreation Area with a priority date of December 31, 1975. The majority opinion concludes the SRBA district court correctly determined Congress expressly reserved a water right in the HCNRA, thus agreeing with the original opinion, but remands the case to the SRBA district court to quantify the "amount of water necessary to fulfill the purpose of the reservation."

However, both the appellants and the majority opinion incorrectly attempt to merge express water rights with the doctrine of implied water rights. Where, as here, Congress expressly reserves water and identifies the amount reserved that expressed reservation controls. § 1(b) of the HCNRA Act provides:

> The Hells Canyon National Recreation Area (hereinafter referred to as the "recreation area"), which includes the Hells Canyon Wilderness (hereinafter referred to as the "wilderness"), the components of the Wild and Scenic Rivers System designated in section 3 of this Act, and the wilderness study areas designated in subsection 8(d) of this Act, *shall comprise the lands and waters* generally depicted on the map entitled "Hells Canyon National Recreation Area" dated September 1975, which shall be on file and available for public inspection in the office of the Chief, Forest Service, United States Department of Agriculture. The Secretary of Agriculture (hereinafter referred to as the "Secretary"), shall, as soon as practicable, but no later than eighteen months after the date of enactment of this Act, publish a detailed boundary description of the recreation area, the wilderness study areas designated in subsection 8(d) of this Act, and the wilderness established in section 2 of this Act in the Federal Register.

HCNRA Act § 1(b) (codified at 16 U.S.C. § 460gg(b)) (emphasis added). Only when a water right must be inferred from an Act of Congress must the *Cappaert* and *New Mexico* standards be employed to quantify the amount of water allocated to the right.

Therefore, I adhere to the Court's original opinion affirming the SRBA district court and hold that the HCNRA Act both expressly reserves a water right and expressly reserved all unappropriated flows of the tributaries of the Snake River within the HCNRA; therefore, it is unnecessary to remand the quantification issue to the district court. It is important to note, however, that the main flow of the Snake River is excluded from this expressed reservation and, therefore, not subject to a federal right. *See* HCNRA Act § 6(a) and (b).

**C. Conclusion**

Based on the foregoing, I respectfully dissent, in part, from the majority's opinion. I would hold that the Wilderness Act implicitly reserves a federal water right in the three Idaho wilderness areas. I would further hold that the HCNRA Act expressly states the amount of water reserved by the federal government and, therefore, no further quantification is necessary by the district court.

Justice WALTERS, specially concurring in the dissent by Justice SILAK and dissenting separately.

I concur with what has been written by Justice Silak. My own independent legal research and consideration of the positions urged by the parties to this action lead me to the conclusion that the federal government has an implied water right with respect to the three wilderness areas under review. I also agree that the reservation of the waters in the tributaries in the Hells Canyon National Recreation Area Act includes all of the water in those tributaries and that quantification of the amount (which would be a momentous if not impossible undertaking) is not necessary. I will add only a few additional observations.

In this case, Justice Schroeder, writing for the majority of the Court, has focused upon the question of whether there is an implied reservation of water rights created through the enactment of the Wilderness Act. On the

other hand, Justice Silak not only disagrees with the conclusion reached by Justice Schroeder as to the effect of the Wilderness Act, but proceeds to take the analysis a step further and considers the language of the statutes that created the wilderness areas in Idaho that are the subject of this dispute. Justice Silak points out that the language in those statutes clearly show an intent to give the federal government the responsibility of protecting the wilderness character of the land through preserving its values for watershed and water quality relationships. This approach does not depend upon the generality of the terms of the Wilderness Act, but is tied directly to the legislation and comments specifically related to the areas set aside in Idaho pursuant to the Act.

I am persuaded that the creation of a wilderness area by the federal government included retaining control over the water needed to maintain the natural state of the environment in such an area. This seems to me logically to be necessary for the benefit of campers, hikers, photographers, kayakers, rafters, boaters and fishers who could utilize and enjoy the existence of streams, rivers, lakes and waterfalls in maintaining the pristine nature of the designated area. It would seem necessary also for the management and protection of big game animals, birds, fish and other wildlife dependent upon the water in the area, in order to preserve the character of the area as a wilderness undeveloped by man. To allow pollution or diversion of those waters by upstream owners of private property would clearly frustrate and essentially destroy the purpose of the wilderness reservations.

It could be argued that without reserved water rights, the areas in question would still remain wilderness nonetheless, albeit perhaps with a more harsh, desolate and less attractive and less desirable character than would be found with responsible management of the water flows within the boundaries of the designated areas. However, I doubt that Congress truly intended to create a "better" wilderness in the nature of an eventual desert in the forestlands of Idaho by ignoring the implied need for a water right.

Finally, I would address another concern sometimes raised with respect to the issues presented to the Court in this case. Fears have been expressed about the amount and nature of control of water that may be exercised by the federal government while the water is located within the boundaries of the Idaho wilderness areas. In my opinion, the authority attendant to an implied water right does not give the government the right to control any part of that water once it flows out of the area. It is not reasonable to suggest that, in its management of the wilderness areas, the government could, for example, impound the water in the area in some great lake in order to later transport the water to another situs, or to otherwise control the use of the water once it has served its purpose within the wilderness area and flows from the area toward the sea. Such an attempted activity by the government certainly would be beyond the authority needed to carry out the objectives either of the Wilderness Act or of the legislation creating the three wilderness areas in Idaho.

Because of the disagreement among the members of the Idaho Supreme Court about the effect of the federally created *Winters* doctrine, I suggest that the parties seek certiorari to the United States Supreme Court for clarification of the application of that doctrine to this case.